**Vasile GRAURE, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 09–CF–350.**

District of Columbia Court of Appeals.

Argued Feb. 22, 2011.
Decided April 21, 2011.

Craig N. Moore, Providence, for appellant.

Suzanne G. Curt, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Elizabeth Trosman, T. Patrick Martin and Kacie Weston, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ, BLACKBURNE–RIGSBY, and THOMPSON, Associate Judges.

THOMPSON, Associate Judge:

A jury convicted appellant Vasile Graure of three counts of assault with intent to kill while armed (AWIKWA), four counts of assault with a deadly weapon (ADW), mayhem while armed, two counts of second-degree burglary while armed, arson, and felony destruction of property, all in connection with a fire at the Good Guys strip club located in the 2300 block of Wisconsin Avenue, N.W., on the evening of November 3, 2007. In this appeal, Graure contends, variously, that the trial court erred when it denied his motion to suppress certain out-of-court and in-court identifications, admitted the out-of-court statements made by a club employee who was engulfed in flames during the fire (and remained in the hospital at the time of trial), curtailed certain cross-examination of the club's manager, and sentenced appellant "based on highly improper considerations." He also contends that the evidence was not sufficient to support his convictions for AWIKWA. Finally, he argues that several of his convictions merge. We address each of these issues in turn, giving our most substantial attention to appellant's argument that his four ADW convictions must merge because they are based on a single assaultive act: igniting the fire that swept through the front section of the club.

For the reasons that follow, we reject appellant's contention as to merger of his ADW convictions. We agree with appellant (and with the government) that his conviction of aggravated assault while armed merges with his mayhem while armed conviction, and that his burglary while armed convictions merge, and we remand for the trial court to vacate either the aggravated assault or mayhem while armed conviction and one of the burglary convictions. In all other respects, we affirm the judgment of the trial court.

## I. Factual Background

Ali Talebnejad, the general manager of Good Guys, testified that he saw appellant enter the club, through the back door, between 4:00 and 5:00 p.m. on the day in question, and observed appellant at various times as he ordered food and drink from his table near the back of the club, got up to tip a dancer, went to the restroom, and used the ATM machine located inside the club.[1] Talebnejad described an incident during which appellant took a photograph of a dancer, which was against club rules. The dancer took appellant's cell phone and gave it to Talebnejad. Talebnejad took the phone to the bar, where there were two other employees, Vladimir Djordjevic,[2] and Kathleen Lazorchack, and asked Djordjevic to check to see whether there were pictures on the phone. Djordjevic found a photograph of the dancer and deleted it. Talebnejad told Lazorchack to return appellant's phone to him and to ask him to leave the club.

Lazorchack, who was a manager at the club, testified that after she told appellant, a little before 8:00 p.m., that he had to leave the club, he picked up his glass of beer and walked toward the front of the club, with Lazorchack trailing him. As appellant reached the door, Lazorchack told him that he could not take his drink outside. Appellant responded by shouting and cursing at Lazorchack and by throwing his glass on the ground, shattering it. Appellant then left the club.

Arefanine Berhane, a cashier at the Chevron gas station located in the 2400 block of Wisconsin Avenue, N.W., testified that he arrived at the station for his shift on November 3 a little before 8:00 p.m., just as appellant was entering the station. Appellant asked Berhane whether the station sold gasoline containers and Berhane showed him a two-gallon can and sold it to him. Appellant also purchased a lighter, paid for and pumped "something like two gallons" of gasoline, and then walked south on Wisconsin Avenue (in the direction of Good Guys).

Valerie Kremer worked as a waitress at Good Guys, and on the evening of November 3 was responsible for serving customers at the three tables in "Section 2," located in the center of the narrow club between the front and back entrances. Kremer saw appellant, whom she had seen in the club earlier in the evening, come back into the club with a red gasoline can and a lighter. Kremer testified that Djordjevic "had his arm around [appellant] to make sure he didn't go any further into the club."[3] Kremer, who was about fifteen feet away from appellant, observed appellant "pouring gasoline anywhere he could possibly pour it." She saw a lighter in appellant's hand, and "knew the fire . . . had ignited" because she "felt heat from behind" her as she ran toward the back of the club. Kremer saw Djordjevic "engulfed in flames" and then saw him in the club's kitchen, trying to put out the fire on his body with the sink hose sprayer. There was so much smoke in the club that it was difficult to see, and customers had

---

1. The government introduced records indicating that appellant used his bank card to withdraw $400 from that ATM shortly after 7:00 p.m.

2. Vladimir Djordjevic's name is also spelled "Djorejevich" in the record.

3. Talebnejad testified that Djordjevic had left the club a few minutes after appellant did, to meet his wife. Gloria Anez, Djordjevic's wife, testified that after joining her, Djordjevic waited for her in their car, which was parked near Good Guys, as she went to purchase groceries. After Anez returned to the car, Djordjevic left the car in a hurry and went back into Good Guys.

to help Kremer get out through the back door.

Frank Raucci, a regular customer at Good Guys, who had observed the incident with appellant's cell phone and saw appellant leave the club, also saw appellant re-enter the club. From where Raucci was sitting in the back of the club, he could see that appellant was struggling with another man as the two men were trying to grab each other's arms. Raucci saw a small flame in appellant's hand, and then saw "a huge fire ball that just went [ ] from floor to ceiling of the whole front of the club." People started "running back toward the back of the club" and the man with whom appellant had been grappling (Djordjevic) was "completely covered in flames" and "his whole body was burning." From the rear of the club, Lazorchack also saw the front of the club in flames from floor-to-ceiling and from wall-to-wall and saw Djordjevic "on fire." Once outside the club, Lazorchack heard "[s]creaming and burning and crackling, mostly screaming and tumbling down the steps" from people who had not yet made it outside.

Stephanie Palmer was working as a "shooter girl" (i.e., she sold shots of liquor to customers) at Good Guys on the evening of November 3. Palmer was seated at the front of the club along with her co-worker Saran Davaan at the time the fire erupted. Palmer saw Djordjevic and another man come into the club "wrestling," with Djordjevic trying to get a "gas canister" from

the man. The man was "pouring liquid all over [Djordjevic],[4] all over the floor, wherever his arm reached." The man "was fighting to pour the gasoline" as Djordjevic grabbed him. A fire started, "flames hit the ceiling," and Palmer and Davaan ran toward the back of the club because the flames "blocked off the doorway" to the front entrance, which would have been "the quickest way to go."[5] Palmer testified that "[i]t was hot," "[t]here was smoke everywhere," she "felt like [her] hair was on fire," and the fire was "amazingly huge." There was a lot of pushing and shoving and people were tripping and falling as they tried to get through the narrow space between the tables in the small club.

Samuel Bond was attending a bachelor party at the club along with Michael O'Quin and others on the evening of November 3, and the men were seated in Section 2, about 18 feet from where the two men at the front of the club were struggling with the gasoline can. Bond testified that there were just a few people between where his group was sitting and the front of the club, but "there was no way for anybody to go out ... the front" because there was "fire all the way across the front portion of the bar and everybody wanted to get away from that."[6]

Fleeing from the fire, Lazorchack had already made her way outside the club through the rear door when she saw Djordjevic emerge from the building sev-

4. A fire investigator testified that the victim (Djordjevic) was "part of the area of origin" of the fire, meaning that "[h]e, basically, was where the fuel and the heat, the ignition came into contact."

5. Palmer and Davaan had been sitting about eight to ten feet from the man with the gas canister, and could smell the gasoline. A fire investigator testified at trial and identified photographs showing heavy charring to a table, chairs and the wall near the front of the

club. The investigator also testified that the fuel "was all in the area," including on the wood paneling.

6. After Bond exited the club from the rear door, he ran to a neighboring business to find a fire extinguisher and then extinguished the flames that were still burning on the tables and chairs in the front part of the club. "It [did not] appear that the fire had caught on ... much further back than that."

eral minutes after the fire started. Djordjevic was "[c]harred from [ ] head to toe," and little was left of his clothing. Djordjevic told Lazorchack to "stay calm" and not to touch him." When Lazorchack asked, "how did this happen," Djordjevic said, "I saw that man coming back with a can and I tried to stop him." Talebnejad also testified that when he saw Djordjevic standing with Lazorchack there was "smoke . . . rising from [Djordjevic]." Talebnejad asked, "what happened?" and Djordjevic told him that "the guy" came back to the club and tried to burn it and that he (Djordjevic) had tried to stop him.[7]

Raucci testified that he could see Djordjevic's exposed veins and tissue where skin had been burned off. Djordjevic never left the hospital where he was taken after the fire, and he eventually died from his injuries. Jessica Schaeffer, one of the dancers at Good Guys who was on the stage located in the front section of the club when the fire ignited, sprained her ankle as she jumped off the stage to try to get out of the club. Of the twenty or more other people who were in the club at the time the fire ignited, no one else sustained injury other than "cuts and bruises from falling down the stairs and over the tables."

Dr. James Jeng, the burn trauma surgeon who treated Djordjevic, testified that Djordjevic sustained third-degree burns over 95% of his body and required multiple skin graft surgeries over a span of many months. Dr. Jeng could smell gasoline on Djordjevic, and testified that "if gasoline is involved, you are going to be dealing with much more severe wounds, much deeper wounds."

Police detectives Molino and Espinosa arrested appellant in his room at a motel in Alexandria, Virginia. At the time appellant had second-degree burns covering his hands and his arms up to his elbows. In appellant's hotel room, officers saw various first aid items and burnt skin in the trash can. An ATF forensic chemist detected gasoline on the shoelaces, jeans, and black shoes recovered from the hotel room.

## II. The Convictions, Sentences, and Arguments on Appeal

 In rendering its verdict on the AWIKWA charges, the jury convicted appellant of three counts of AWIKWA (as to club employees Djordjevic, Palmer, and Davaan) and four counts of ADW (as to waitress Kremer, bachelor party attendees Bond and O'Quin, and dancer Schaeffer).[8]

---

7. Talebnejad had gone home to his apartment, which was two or three minutes away from the club, about ten minutes after appellant was escorted out, and immediately returned to the club after he received a phone call about the fire.

8. The trial court sentenced appellant to a period of incarceration of 368 months. During the sentencing proceedings, the court asked appellant if he had anything to say, and the following exchange ensued:

APPELLANT: First of all, I'm glad how much my attorney learned about me in the 30 minutes that we talked. When I was arrested, I had no recollection of the events of that night. I was that drunk. Although the witnesses when testifying at the trial didn't remember serving me about 50

drinks . . . I have very few answers and very few details to present to anyone. . . .
COURT: All right, well, it's hard to have mercy for you, Mr. Graure.
. . .
COURT: Just to stand here and say your lawyer, you, that I was inebriated, but that's not how you chose to defend this case.
APPELLANT: I didn't choose to defend.
COURT: You chose to say "I didn't do anything." To say there's a lack of remorse here is an understatement. The cloud that hangs over this proceeding obviously is the devastating injuries that you caused to [Djordjevic]. . . . If there was any way at all to impose a sentence that would assist him or improve his prospects, if that could be done, I would give you the chair, Mr. Graure. But that can't be done.

## A. Identifications

We now turn to appellant's contention that the trial court erred by denying his pretrial motion to suppress out-of-court identifications by Berhane and Kremer.[9] Appellant's principal contention is that the photo arrays used were impermissibly suggestive because his photo differed markedly from the others in each array. With regard to the photo array shown to Berhane, appellant contends that "[t]he pictures of men other than [him] were almost exclusively Latino," whereas he is of European (Romanian) origin. With regard to the photo array shown to Kremer, appellant argues that his head as shown in his photo is square-shaped while the other photos are of men with rounder heads and with head and facial hair that is lighter in color, and facial hair that is less extensive, than his. Discerning no way in which appellant's photo stands out, we disagree.

In the nine-man photo array shown to Berhane, all of the men depicted have dark hair and rounded faces. All but one (appellant included) seem to be heavy set, all but one (again, appellant included) have full heads of hair, and all appear to be close in age and weight. The lighting differs somewhat from photograph to photograph, but only one man (not appellant) seems to have a distinctly different (darker) skin tone than the others. Three of the men appear to be of Latino origin, and four or five others (including appellant) look like they could be of either Latino or European descent. In the nine-man photo array shown to Kremer, all of the photos depict brown-haired males who look like they could be of European descent, who have receding hairlines, similar skin tones, and similar amounts of facial hair, and who appear to be close in age. At least four of the other men have a jaw or crown shape similar to appellant's. In short, the trial judge's finding that there was nothing suggestive about the two arrays is supported

Appellant now argues that the court gave him a disproportionate sentence because he exercised his right to go to trial. He asserts that it is "[in]appropriate to punish someone for not expressing remorse for or admitting to actions of which one has no recollection."

While the trial judge used very strong language in his remarks, we see no error that warrants correction or any abuse of discretion in the sentencing. It is well-established that a sentencing judge may show leniency to a defendant who demonstrates remorse and who takes responsibility for his actions, *Coles v. United States*, 682 A.2d 167, 169 (D.C. 1996), and we have recognized that "[i]mplicit in this authority to extend leniency to a defendant who pleads guilty must be the discretion to withhold leniency from others who appear less deserving." *Id.* (internal quotations omitted). In addition, we are not persuaded that the court penalized appellant for exercising his right to go to trial and put the government to its proof. Viewed in the context of the entire proceeding, the court's statement must be taken as a reflection of the trial judge's (quite understandable) disapprobation of appellant's attempt, at the time of sentenc-

ing, to blame individuals who had not set the fire for his convictions, and of appellant's failure to acknowledge the grave injury that had ensued.

9. At the suppression hearing, Metropolitan Police Department ("MPD") Detective Molino testified that he showed Berhane a photo array that included, at position seven, a 2005 picture of appellant obtained from the Department of Homeland Security. The array contained eight other photographs chosen, from an arrest data bank, based on similarities to appellant's "[h]air, facial characteristics, [and] complexion." Berhane selected two photos—of appellant and the man in position one—as resembling the person who purchased the gas can and cigarette lighter. The photo array shown to Kremer contained appellant's arrest photo at position six, and eight other photos that Detective Molino testified he selected as "consistent with [appellant's] arrest photo." Kremer picked appellant's photo and photo nine as resembling the person who returned to the club with the gas container.

by the record. *Cf. Bolanos v. United States,* 938 A.2d 672, 685 (D.C.2007) (recognizing that we are bound by the trial court's findings on suggestivity so long as they are "supported by the evidence and are in accordance with the law").[10]

■■■ Appellant next contends that the trial court erred in allowing Raucci's in-court identification testimony. The background of this argument is that, during the suppression hearing, the government indicated that it would seek to present testimony about only four out-of-court identifications (those by Talebnejad, Lazorchack, Berhane, and Kremer), and the court therefore limited the scope of appellant's cross-examination to those identifications. Upon direct examination at trial, however, Raucci made an in-court identification of appellant. During cross-examination, Raucci testified that he picked photos "2, 4 and 9" from a photo array during an out-of-court identification procedure (whereas the photograph of appellant included in the array was photo number 6). On re-direct, however, the government introduced into evidence a viewing sheet showing that, upon reviewing the photo array, Raucci actually had pointed to photos two, four, and six (appellant's photo, which prompted Raucci to comment that the man he described had a "face ... round like his") and stated that he would need to "see a

side view ... [to] tell better maybe." Thus, the court heard that Raucci did demonstrate some capacity to recognize appellant during the out-of-court identification procedure. We agree with the government that this background undermines appellant's argument that the court should have disallowed Raucci's in-court identification as unreliable since (appellant asserted) Raucci failed to make an out-of-court identification.[11] The argument fails for the additional reason that "the absence of pretrial identification of the accused by a witness does not preclude that individual from giving in-court identification testimony." *Middleton v. United States,* 401 A.2d 109, 133 (D.C.1979). The uncertainty and tentativeness of Raucci's out-of-court photo selections go to "the weight to be accorded [his] in-court testimony, and not to its admissibility." *Id.* The court did not abuse its discretion in admitting the in-court identification, as its reliability could be—and was—fully aired before the jury and appropriately left for it to consider. *See Manson v. Brathwaite,* 432 U.S. 98, 116, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) ("[identification] evidence with some element of untrustworthiness is customary grist for the jury mill").

**B. Statements by Victim Djordjevic**

■■■ We next turn to appellant's argument that the trial court erred in admit-

---

**10.** Appellant also argues that the trial court erred by allowing testimony about the photo identifications made by Berhane and Kremer because the circumstances in which those identifications were made rendered them unreliable. However, having justifiably found that the photo arrays were not unduly suggestive, the court could properly leave the issue of reliability to the jury rather than make reliability findings itself. *Scales v. United States,* 687 A.2d 927, 937 n. 15 (D.C.1996) ("No reliability determination is required unless the trial court has determined that the eyewitness identification was unduly suggestive"). *But cf. Greenwood v. United States,* 659 A.2d 825, 828 (D.C.1995) (noting that we

have "frequently encouraged trial judges, even when finding there was no suggestivity, to make explicit reliability findings," because, "in that occasional case where we disagree with the no suggestivity finding, or where that finding presents a close question, the appeal can be resolved based on the outcome of the reliability determination without the need to remand for findings on that point").

**11.** The record shows that it was Palmer rather than Raucci, who could not make an identification. Palmer testified that she "couldn't recognize any of [the men whose photos were included in the array]."

ting Djordjevic's statements to Lazorchack and Talebnejad—i.e., his statements that he "saw that man coming back with a [gas] can" and "tr[ying] to burn" the club, and that he (Djordjevic) "tried to stop him" [12] —over defense objections that the statements were both inadmissible hearsay and testimonial statements whose admission violated appellant's Confrontation Clause right to confront the witnesses against him. We conclude that the court did not err when it admitted the statements as non-testimonial excited utterances.

"A spontaneous or excited utterance is a well-recognized exception to the hearsay rule." *Johnson v. United States,* 980 A.2d 1174, 1185 (D.C.2009). Three factors must be established before a statement may be admitted into evidence as an excited utterance:

> (1) The presence of a serious occurrence or startling event which causes a state of nervous excitement or physical shock in the declarant; (2) a declaration made within a reasonably short period of time after the occurrence so as to assure the declarant has not reflected upon the event and possibly invented a statement; and (3) the presence of circumstances that in their totality suggest the spontaneity and sincerity of the remark.

*Id.* The critical factor is that "circumstances reasonably justify the conclusion *that the remarks were not made under the impetus of reflection." Odemns v. United States,* 901 A.2d 770, 777 (D.C.2006) (emphasis in the original). "When an appellant challenges the trial court's admission of hearsay statements as excited utterances, the underlying factual findings are reviewed under the clearly erroneous standard." *Melendez v. United States,* — A.3d —, — (D.C.2011) (citation and internal quotation marks omitted). "As with all hearsay exceptions, the determination of whether a statement falls under [the excited utterance] exception ... is a legal conclusion, which we review *de novo." Id.* (citations omitted). "Once we have determined that a statement qualifies for the excited utterance exception, the decision whether to admit or exclude the proffered statement ... is reviewed for abuse of discretion." *Id.* (citations omitted).

Here, the trial court did not err in finding that Djordjevic's statements qualified as excited utterances. As the trial judge noted, the evidence established that Djordjevic made the statements to his co-workers "within moments" of emerging from the back door of the club, having been "completely burned," when smoke was still rising from his body and his skin "was rolled off." At the time, "everybody" standing in the area behind the club was in "[c]onfusion" and "shock" and "sort of a little bit bewildered." The scenario was "overwhelming." Djordjevic in particular was "screaming" and "shouting," was "very frantic" and "very nervous," and was "just in shock."

Appellant argues that Djordjevic's statements do not qualify as excited utterances because Djordjevic himself was "composed enough" to tell Lazorchack to "stay calm," and because "the situation had calmed considerably" by the time Djordjevic spoke to his colleagues. However, ample evidence—of Djordjevic's physical condition, demeanor, and tone of voice—supported a finding that Djordjevic was in a state of "nervous excitement [and] physical shock" at the time he spoke. *Johnson,* 980 A.2d at 1185. Djordjevic's condition, rather than calming, was growing worse as time

12. Djordjevic's wife also testified that when she first saw her husband emerge from the rear of the club, when there were "maybe flames on his legs," she heard him shout, "It's the guy ... It's the guy."

passed: a police officer who arrived on the scene testified that Djordjevic "had that thousand mile stare" and, when the officer asked him questions, had no "reaction at all, not in the eyes, no body movement, no body motion, anything." [13] While most of the testimony indicated that Djordjevic's statements were made several minutes after he had succeeded in extinguishing the flames on his body, [14] this court has accepted as excited utterances statements made after the elapse of considerably longer periods between the startling event and the out-of-court statements. *See, e.g., Reyes–Contreras v. United States*, 719 A.2d 503, 505–06 (D.C.1998) (excited utterance admitted when statements were made thirty minutes after startling event when victim was crying and upset); *Smith v. United States*, 666 A.2d 1216, 1223 (D.C.1995) (excited utterance admitted when it was made no more than fifteen minutes after the startling event).

 We also reject appellant's arguments that Djordjevic's statements should have been excluded because they were "in response to questioning" from his co-workers who had "management responsibilities" and for whom "it was part of

their job to get information," and because Lazorchack had already called 911 and had shouted to a uniformed man (who may have been a Secret Service officer assigned to the nearby Vice–Presidential mansion) before she prompted the statements from Djordjevic by asking, "[H]ow did this happen[?]" The critical factor is whether "the nature of the questions required deliberative and thoughtful answers." *Reyes v. United States*, 933 A.2d 785, 791 (D.C. 2007). "[R]esponses to preliminary investigative questions, made while the declarant is still under the spell of the startling event, may qualify as spontaneous utterances because the questions are asked to ascertain the nature of the emergency and do not provide an opportunity for the declarant to reflect on the event or to premeditate a response." *Id.* The trial court did not err in finding that this was the case here. [15]

 Nor did the trial court err in finding that Djordjevic's statements were not testimonial. [16] In determining whether a statement made in response to questioning was testimonial for purposes of the Confrontation Clause, a principal factor to

---

13. The officer testified that "it was something like out of a Road Runner cartoon where Wiley Coyote was just blown up by the Road Runner with dynamite just standing there charred and not responsive to anything."

14. As already noted, however, Djordjevic's wife testified that there were still "maybe flames on his legs" around the time he spoke.

15. Appellant also complains that Djordjevic was not in a position to view appellant and therefore lacked personal knowledge to support his statement about "that man [who had been expelled] coming back" with a gasoline can. We disagree. The evidence was that Djordjevic was working at the rear of the club and adjacent to the area where appellant was watching the dancing, and supports an inference that Djordjevic could see appellant throughout the time when he was at the club and a further inference that, upon seeing the

man with the gas can, Djordjevic was able to recognize him as the same man.

16. Whether the statements were testimonial is a question of law that we review *de novo*. *See Thomas v. United States*, 978 A.2d 1211, 1225 (D.C.2009). As the Supreme Court observed in *Crawford v. Washington*, 541 U.S. 36, 51, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." That said, the Court has not ruled out the possibility that "statements made to someone other than law enforcement personnel" could be "testimonial." *Davis v. Washington*, 547 U.S. 813, 823 n. 2, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

be considered is the primary purpose of the interrogation. *Michigan v. Bryant,* —— U.S. ——, 131 S.Ct. 1143, 1152–56, 179 L.Ed.2d 93 (2011) (considering statements made in response to questioning by police officers).[17] As the Supreme Court explained in *Bryant,* "[a]n objective analysis of the circumstances of an encounter" provides the most accurate assessment of "the primary purpose of an interrogation." *Id.* at 1156 (internal quotations omitted). The relevant inquiry is "the purpose that reasonable participants would have had" for their questions. *Id.* "When … the primary purpose of an interrogation is to respond to an 'ongoing emergency,' its purpose is not to create a record for trial and thus is not within the scope of the Clause." *Id.* at 1155 (holding that shooting victim's statements to police in response to questions about "what had happened, who had shot him, and where the shooting had occurred" were not testimonial (at 1163)). *Bryant* makes clear that an objectively reasonable belief that there is an ongoing emergency need not "narrowly focus on whether the threat solely to the first victim has been neutralized," but instead may be based on "the type of weapon employed," since that can be indicative of whether there is "a potential threat to the responding police and the public at large" and whether any threat has ended. *Id.* at 1156, 1158. "The medical condition of the victim" also is important to the primary purpose inquiry, since it "sheds light on the ability of the victim to have any purpose at all in responding to … questions and on the likelihood that any purpose formed would necessarily be a testimonial one." *Id.* at 1159 (reasoning

that a severely injured victim or one who is in considerable pain "may have no purpose at all in answering questions posed; the answers may be simply reflexive. The victim's injuries could be so debilitating as to prevent her from thinking sufficiently clearly to understand whether her statements are for the purpose of addressing an ongoing emergency or for the purpose of future prosecution." (at 1161)). In addition, whether a statement made in response to questioning will be deemed testimonial depends on "the informality of the situation and the interrogation." *Id.* at 1166. A situation that is "fluid and somewhat confused," as questioners try "simply to address what they perceived to be an ongoing emergency," is likely to have "lacked any formality that would have alerted [the victim] to or focused him on the possible future prosecutorial use of his statements." *Id.*

Here, all of the factors that the Supreme Court identified in *Bryant* support a conclusion that Djordjevic's statements were not testimonial. The questioners were not police officers but general manager Talebnejad (who was away from the club when the fire started) and manager Lazorchack (who was at the rear of the club when the fire started at the front of the building)—i.e., acquaintances of Djordjevic who had not been in a position to witness the scenario of Djordjevic trying to wrest the gasoline can from appellant. Thus, neither questioner knew what had caused the fire or whether whatever or (whoever) had caused the fire continued to pose a risk to workers and patrons or to the club premises. Talebnejad testified that he not only asked Djordjevic what had happened, but

---

17. In *Bryant,* the Supreme Court provided "further explanation" and "additional clarification" with regard to "what *Davis* meant by 'the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.'" *Id.* at 1156. However, to date,

the Court has not adopted a comprehensive definition of "testimonial" or "attempt[ed] to produce an exhaustive classification of all conceivable statements … as either testimonial or nontestimonial." *Id.* at 1155 (quoting *Davis,* 547 U.S. at 822, 126 S.Ct. 2266).

also went inside the club to see whether anyone remained inside, testimony that evinced that he was acting to address what he perceived to be an ongoing emergency.[18] Moreover, what had injured the visibly burned Djordjevic was fire, a weapon that could have continued to pose a threat to those in or near the club. Further, witnesses described the scene as one of confusion and bewilderment; thus, the situation did not involve formal or structured questioning. Finally, Djordjevic's medical condition obviously was grave, making it likely that Talebnejad's and Lazorchack's questions would not have "focused him on the possible future prosecutorial use of his statements," and that his answers to their questions about what happened were "simply reflexive." *Bryant*, 131 S.Ct. at 1162, 1166. In light of all these facts and circumstances, the trial court did not err in admitting Djordjevic's out-of-court statements as non-testimonial.

### C. Limitation of Cross–Examination

■ The defense theory was that appellant did not return to the club after he was told to leave and thus had no role in the fire. Nevertheless, through his cross-examination of Talebnejad, appellant's defense counsel sought to establish that, as the general manager of Good Guys, Talebnejad had an interest in limiting his responsibility for both appellant's claimed intoxication and the resulting incident. After a lengthy cross-examination of Talebnejad about his status as manager and his potential liability if someone is served excessive alcohol at the club, the court sustained the government's objection that the testimony was cumulative and irrelevant. The trial judge stated that there

was not a "shred of evidence" to support appellant's theory that Talebnejad was fabricating to protect himself from liability. Appellant sought to return to the line of questioning toward the end of the cross-examination, advising the court that he wanted to establish why Talebnejad (who testified that appellant had four or five drinks at the club) was not being forthcoming about how much appellant had been drinking. The court, stating that it he did not want to "turn[ ] this into an alcohol board [ ] hearing," then permitted defense counsel to ask one question to the effect of "if an investigation uncovers that this fire occurred because a patron was over served liquor, is it correct that a bar could lose its license, and there could be other consequences?"[19] Appellant now asserts that the trial court's "decision not to allow [further] cross examination [*sic*] about such bias" violated his Sixth Amendment rights.

■ We agree with the government that it "remains uncertain" how the issue of Talebnejad's potential responsibility would have shown a motivation on his part to fabricate testimony implicating appellant in the events of November 3. In any event, what the Sixth Amendment Confrontation Clause guarantees is "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (emphasis in original). "Once a trial court has allowed sufficient meaningful cross-examination, consistent with a defendant's constitutional Confrontation Clause right, this right is subject to reasonable limits imposed at the discretion of

---

**18.** Talebnejad also testified that he asked Djordjevic "what happened" not because he "wanted to know whether a crime had occurred" but because he "just wanted to know

what happened, because [Djordjevic] was on fire."

**19.** Talebnejad responded to the question in the affirmative, saying "To fine, yes."

the trial judge." *Kaliku v. United States,* 994 A.2d 765, 785 (D.C.2010) (internal quotations omitted). It is axiomatic that a trial judge may curtail cross-examination because of concerns of "interrogation that is repetitive or only marginally relevant" without violating a defendant's Confrontation Clause rights. *Id.* Here, we are satisfied that the questioning that the court permitted gave appellant's counsel sufficient latitude to explore the issue of Talebnejad's purported bias and did not abuse its discretion in cabining a repetitive and (at best) marginally relevant line of questioning.[20]

## D. Sufficiency of the Evidence to Support the AWIKWA Convictions

The jury found appellant guilty of three counts of AWIKWA, one count as to Djordjevic, and the other two counts as to Palmer and Davaan, the waitresses who were not injured but who were seated at a table near the front entrance of the club. Appellant contends, as to each of those individuals, that the evidence showed only an intent to burn and destroy some of the club's premises and was insufficient to establish that appellant had the specific intent to kill anyone.

■■■■ In determining whether the evidence was sufficient to support the AWIKWA convictions, we "consider the evidence in the light most favorable to the government to determine if it was sufficient to permit reasonable jurors to find guilt beyond a reasonable doubt." *Nixon v. United States,* 730 A.2d 145, 148 (D.C. 1999) (citations and internal quotation marks omitted). "[I]t is only where the government has produced no evidence from which a reasonable mind might fairly

infer guilt beyond a reasonable doubt that this court can reverse a conviction." *Id.* (citation omitted). To prove AWIKWA, the government must prove that a defendant acted with the specific intent to kill. *Id.* The standard jury instructions do not permit conviction upon proof only that a defendant acted with conscious disregard of the risk of death or serious injury. *See Boykins v. United States,* 702 A.2d 1242, 1246 n. 1 (D.C.1997) (describing instruction to jury that "[f]or assault with intent to kill[,] . . . you must find specific intent to kill, not 'conscious disregard' ").

■■■■ Regarding Djordjevic, appellant points out that there was no evidence of animosity towards him and no evidence that a particularly vulnerable area of his body was targeted. There was, however, evidence that appellant became angry and violent when he was ejected from the club—he yelled obscenities at Lazorchack, and he smashed his beer glass to the ground. Further, the evidence showed that, having returned to the club with a gasoline can, appellant had to wrestle with Djordjevic, who sought to thwart appellant's efforts to spread gasoline. Appellant responded by pouring gasoline all over Djordjevic—so much gasoline that the fire inspector identified Djordjevic as an "area of origin" of the fire. Appellant's lethal intent toward Djordjevic could be inferred from the circumstances of appellant's igniting his lighter when the gasoline-soaked Djordjevic was in close range. *See Gray v. United States,* 585 A.2d 164, 165 (D.C. 1991) ("Intent can rarely be proved directly, and must often be discerned from the surrounding circumstances."). We have no trouble concluding that the jury could infer from appellant's actions in pouring

**20.** Further, at least one other government witness testified that appellant was drunk when he left the club, thereby minimizing whatever prejudice might have ensued to appellant from curtailment of questioning that sought to establish, through Talebnejad's testimony, that appellant was over-served alcohol.

gasoline on Djordjevic and igniting a lighter that he intended to kill Djordjevic by inflicting the "much more severe wounds, much deeper wounds" that a gasoline-fueled fire produces.

 Although the evidence that appellant had a specific intent to kill Palmer and Davaan is not quite as overwhelming, we conclude that it was sufficient to support the convictions. We note first that, to prove that appellant had the specific intent to kill Palmer and Davaan, the government was not required to show that he actually wounded them. *Bedney v. United States,* 471 A.2d 1022, 1024 (D.C.1984) ("[A] lethal intent can be demonstrated without showing that the assailant succeeded in wounding his intended victim."). We also are guided by the principle that the evidence need not "exclude every hypothesis inconsistent with an intent to kill"—i.e., "[t]he evidence need not *compel* a finding of guilt beyond a reasonable doubt." *Gray,* 585 A.2d at 165 (emphasis in original).

 Palmer and Davaan were seated a mere eight feet from where appellant, struggling with Djordjevic, poured gasoline "wherever he could reach." The jury could infer that appellant could see the two women, especially in light of the evidence that, while wrestling with Djordjevic, appellant came close enough to the women to hit chairs in the area where they were seated. Appellant spread gasoline across the front width of the club, even reaching the wall paneling, with the result that the ensuing fire blocked the front exit, the quickest path out for Palmer and Davaan. The fire was "amazingly huge," spreading from floor to ceiling and wall to wall; the gasoline accelerant caused it to spread fast; it charred chairs and a table in the area where the two women were seated; and it burned so hot that Palmer felt like her hair was on fire. Lazorchack testified that the "whole front end" of the club was "burned down." TVs and the ATM located in that section of the club were melted, "[e]very bit of wood that was on the walls was black," and menus were "burnt up." Together, this evidence permitted the jury to infer that, by his actions, appellant was "bound to place in peril the lives of" Palmer and Davaan, *id.,* and thus that he had the specific intent to kill them. It was not necessary for the evidence to show, or for the jury to find, that appellant bore any specific animus toward either of them. *Fletcher v. United States,* 335 A.2d 248, 251 n. 5 (D.C.1975) (holding that jury could infer that defendant acted with specific intent to kill police officers where he fired at them at very close range before they drew their guns).[21]

---

**21.** In addition to instructing the jury on the elements of assault with intent to kill, the trial court instructed the jury on the theory of "concurrent intent," telling them that "[i]f a person intentionally creates a zone of harm to ensure the death of one or more individuals under the principles of concurrent intent, you may infer, but are not required to infer from the method used an intent to kill others within the zone of harm." This court has applied the doctrine of concurrent intent to uphold an AWIKWA conviction even as to an individual in the "zone of harm" who was not physically injured by the assaultive conduct. *See Nixon,* 730 A.2d 145 (upholding AWIKWA conviction as to victim Taylor as well as to victims wounded in shooting). Because appellant does not argue that it was error for the court to give this instruction on the evidence presented, we need not speculate about whether the jury inferred specific intent on the basis of a theory of concurrent intent or instead inferred specific intent from the evidence we have described (or other evidence in the case) without relying on that theory. We also need not address whether the evidence permitted the jury to find that appellant "created a zone of harm" that included Palmer and Davaan in an effort "to ensure the death of" Djordjevic or other individuals. *Cf. Nixon,* 730 A.2d at 149 (explaining that under the doctrine of concurrent intent, "[w]here the means employed to commit the crime against a primary

## E. Merger

■■■■ Appellant asserts that his four convictions of ADW all relate to a "single assaultive act" [22]—"the single act of lighting fire to gasoline"—and therefore must merge. We disagree.[23]

■■■■ We consider the factual circumstances of each case to determine whether what is claimed to be a single assaultive episode will support multiple convictions. *James v. United States*, 718 A.2d 1083, 1087 (D.C.1998). A number of factors are relevant, including (1) whether the episode consisted of "distinct, successive assaults;" [24] (2) the number of individuals injured; (3) whether the defendant took a step toward effectuating physical injury (or stopped short of that, engaging only in conduct that could reasonably be expected to engender fear); and (4) whether the purpose of the relevant criminal statute is to proscribe specified conduct, or instead to protect individuals from harm.

■■■■ In general, where the evidence is that the defendant committed a single assaultive act directed at a group of persons, such as by firing a single shot, multiple assault convictions will merge. *See, e.g., Joiner v. United States*, 585 A.2d 176, 178 (D.C.1991) (holding that where defendant fired a single shot in the direction of the group of seven men, his seven convictions for ADW merged, because "only one assaultive act occurred" and defendant "committed but one criminal act"); *Horton v. United States*, 541 A.2d 604, 612 n. 10 (D.C.1988) ("[A]ny two convictions arising from the firing of a single shot would merge on the facts of this case."). By contrast, "where multiple shots are fired at more than one person, multiple convictions are appropriate." [25] *McCoy v. United*

victim created a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone") (citations omitted).

**22.** *Clark v. United States*, 639 A.2d 76, 78 (D.C.1993) (observing that government correctly did not contest claim that three assault counts merged where evidence showed that defendant "drew a pistol, and stuck it through the partially opened passenger side window, threatening to shoot Fereno and demanding that Fereno, Cogswell, and Tudge give him their money," eventually shooting only Fereno).

**23.** We review the issues of merger *de novo. Nixon*, 730 A.2d at 151–52.

As already discussed, appellant argues that the evidence was not sufficient to support his AWIKWA convictions, and that each should be reduced to the lesser included offense of ADW. He then argues that all of his ADW convictions should merge. We have rejected his insufficiency argument, and, as we read his briefs, they do not urge that any of the AWIKWA convictions upheld on sufficiency grounds should merge with each other, or with any ADW conviction. To the extent appellant did intend to advance any such contentions, we deem them abandoned and do not address them, since the briefs contain no argument on the point(s). *See Drake v. McNair*, 993 A.2d 607 (D.C.2010) (deeming an issue waived where party failed to include in her brief any substantive argument related to the issue).

**24.** *Gray v. United States*, 585 A.2d 164 (D.C. 1991).

**25.** The same result follows where multiple victims have been wounded by the assault: the convictions do not merge. *See, e.g., Ruffin*, 642 A.2d at 1298 ("[W]here a single assaultive act results in the criminal injury of multiple victims, there may be as many offenses as there are victims."); *Williams v. United States*, 569 A.2d 97, 104 (D.C.1989) (holding that the offense of manslaughter "is determined by reference to the number of victims who die as a result of the defendant's actions, not by reference to the number of acts causing death," and concluding that even if Williams's act of striking seven pedestrians and killing them constituted only a single act, he could be sentenced for seven counts of manslaughter); *Murray v. United States*, 358

*States,* 890 A.2d 204, 214 n. 28 (D.C.2006) (quoting *Ruffin v. United States,* 642 A.2d 1288, 1296 (D.C.1994)); *James,* 718 A.2d at 1087 (holding that two of James's four ADW convictions could stand despite absence of physical injury because he fired two shots into apartment window and knew of the presence in the apartment of at least two individuals); *Gray,* 585 A.2d at 165 (holding that where defendant fired three shots with a double-barreled shotgun through a screen door behind which he could see three children, "separate crimes were committed, and separate sentences were appropriate" and three AWIKWA convictions would stand, even though only one of the children was struck). We have not had occasion to consider whether the setting of a fire—which by its nature spreads and can injure many persons in its path—is analogous to firing a single shot or more akin to firing a hail of bullets toward a group of persons. However, at least one other court has explicitly ruled that where the defendant set a single fire that caused occupants of a building to be evacuated, multiple convictions for assault would stand. *See Hathaway v. State,* 925 P.2d 1343, 1346 (Alaska Ct.App.1996) (allowing to stand eight convictions for assault where defendant lit papers on fire in an apartment, causing the apartment building to burst into flames and nine resi-

dents and visitors in other apartments in the building to be evacuated).[26]

Although we need not decide in this case whether every act of arson that causes the evacuation of multiple individuals will support separate ADW convictions as to each individual who was in the building, we are persuaded on the facts of this case that a result similar to the result in *Hathaway* is appropriate: the four ADW convictions may all stand. For one thing, the evidence in this case that appellant "was fighting to pour the gasoline" as Djordjevic grabbed him—i.e., the evidence that appellant repeatedly started, was thwarted in, and started again his attempts to douse the club with gasoline—permits an inference that appellant made distinct, successive attempts to ensure that fire would burn intensively at various points in the club. For another thing, each of the victims named in the ADW charges (as lesser-included charges of AWIKWA) was close to (i.e., within 15 to 18 feet of) the front of the club where the fire broke out and (unlike workers and patrons who were near the back of the club) had to retreat not only from the threat of fire but also from nearby flames.

 To put it differently—and important to our analysis—the ADW victims were not merely put in fear; rather, the evidence showed, they were in the path of physical injury from the fire.[27] This dis-

A.2d 314, 320 (D.C.1976) ("a trial judge has the power to impose consecutive sentences for the negligent homicide of two persons in a single automobile accident"). These cases do not support allowing all four ADW convictions to stand here, because, although there was evidence that some club patrons sustained "cuts and bruises from falling down the stairs and over the tables," this evidence was not tied to ADW victims Kremer, Bond, O'Quin or Schaeffer, and the evidence that Schaeffer sprained her ankle as she jumped off the stage to try to get away from the fire was proof of (indirect) physical injury to a single ADW victim.

26. Although not specifically addressing the issue, this court, too, has allowed multiple ADW counts to stand as to individuals who were inside a building that was set on fire. *See Peoples v. United States,* 640 A.2d 1047, 1049–50 (D.C.1994) (not analyzing possible issue of merger of ADW convictions, but allowing six ADW counts to stand as to one individual who escaped from burning house unharmed as well as to five individuals who suffered severe burns as a result of the arson).

27. The government did not charge appellant with ADW as to the many other patrons who were in the club at the time the fire was

tinguishes this case from cases in which this court and others have reasoned that a single *threat* directed to a group of people required merger of ADW convictions. *See, e.g., Smith v. United States*, 295 A.2d 60, 61 (D.C.1972) (holding, in case where defendant patted his pocket and told two men he had a gun, that "a single threat directed to more than one person constitutes but a single unit of prosecution"); *United States v. Alexander*, 471 F.2d 923, 932–34 (D.C.Cir.1972) (holding, in case where defendant pointed his gun at a group of four individuals, that "where by a single act or course of action a defendant has put in fear different members of a group towards which the action is collectively directed, he is guilty of but one offense"). As we recognized in *McCoy*, the rule that "a single assaultive act directed at a group of individuals, but injuring no one, bears only one count of assault" applies in cases involving "'threat to do bodily harm' assault" (sometimes called "intent-to-frighten assault"), but does not apply in cases involving "'attempted-battery' assault," which has different elements.[28] 890 A.2d at 214 n. 28; *see also Joiner*, 585 A.2d at 178 (citing *Alexander* for the proposition that "a defendant is guilty of only one offense if he *puts in fear* different members of a group towards which collectively he directs his action") (emphasis added). In this case, the jury was not instructed on the elements of intent-to-frighten assault, but was instructed only on the elements of attempted-battery assault[29]—assault that involves "an attempt to cause a physical injury, which may consist of any act tending to such corporal injury." [30] *Robinson*, 506 A.2d at

started, but who were not in the path of physical injury.

**28.** Intent-to-frighten assault "requires proof that the defendant intended either to cause injury or to create apprehension in the victim by engaging in some threatening conduct; an actual battery need not be attempted." *Robinson v. United States*, 506 A.2d 572, 574 (D.C.1986). "Attempted-battery assault requires proof of an attempt to cause a physical injury, which may consist of any act tending to such corporal injury, accompanied with such circumstances as denote at the time an intention, coupled with the present ability, of using actual violence against the person." *Id.* (citation and internal quotation marks omitted).

**29.** Specifically, the jury was instructed that the government must prove that the defendant "made an attempt or effort with force or violence to injure another person."

**30.** In *Ladner v. United States*, 358 U.S. 169, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958), the Supreme Court gave the following rationale for why intent-to-frighten assault supports only a single conviction:

[Such] an assault is ordinarily held to be committed *merely by putting another in apprehension of harm* whether or not the actor actually intends to inflict or is capable of inflicting that harm. Thus [if consecutive punishments were allowed], one who shoots and seriously wounds an officer would commit one offense punishable by 10 years' imprisonment, but if he points a gun at five officers, putting all of them in apprehension of harm, he would commit five offenses punishable by 50 years' imprisonment, even though he does not fire the gun and no officer actually suffers injury. It is difficult ... to find that Congress intended this result.

*Id.* at 177, 79 S.Ct. 209 (emphasis added) (footnote signals omitted). By contrast, we explained in *Murray* why separate punishments for attempted-battery assault are warranted:

A defendant who commits an act of violence ... *by a means likely to cause harm to several persons* is more culpable than a defendant who harms only one person. For example, a defendant who chooses a means of murder that places a planeload of passengers in danger, or results in injury to many persons, is properly subject to greater punishment than a defendant who chooses a means that harms only a single person. 358 A.2d at 321 (emphasis added) (quoting *Neal v. State*, 55 Cal.2d 11, 9 Cal.Rptr. 607, 357 P.2d 839, 844 (1960) (en banc)).

574 (internal quotations omitted). Thus, appellant's ADW convictions reflect jury findings that appellant committed an act or acts tending toward corporal injury of Kremer, Bond, O'Quin and Schaeffer. On those findings, we hold, the four convictions for ADW should all stand.

 The result we reach in this case is consistent with our case law that mandates that we take guidance from the purpose of the applicable criminal statute and the "unit of prosecution" intended by the legislature.[31] In *Ruffin*, for example, we reasoned that because it is "beyond question" that the purpose of the statutes proscribing murder and AWIK is the protection of individuals, convictions for both AWIK and murder could stand where the single bullet

that killed one victim grazed the ear of the other. 642 A.2d at 1298.[32] In *Speaks v. United States*, 959 A.2d 712 (D.C.2008), we declined to order merger of defendant's three convictions of second-degree cruelty to children. The evidence was that defendant carjacked and then crashed a vehicle in which three young children were riding. Only one of the children sustained a physical injury, but all three sustained emotional pain and suffering, "i.e., they were 'terrified' and 'screaming' when their mother retrieved them from her vehicle" and, as a consequence of the collision of the vehicle with a parked car, the airbags in their vehicle deployed.[33] *Id.* at 717. We reasoned that the crime with which Speaks was charged "was intended to protect individual victims, and that consequently, the

31. Discerning legislative intent is key in determining whether offenses merge, as "the question of what punishments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed." *Byrd v. United States*, 598 A.2d 386, 388–89 (D.C.1991) (citing authority that "[t]he role of the constitutional guarantee [against double jeopardy] is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense") (alteration in the original) (citations and internal quotation marks omitted).

32. *Cf. Alexander*, 471 F.2d at 932 ("Since there is no doubt that the robbery statute was designed to safeguard individual citizens from being robbed, we do not think that the District Court was wholly lacking in power to impose consecutive sentences in respect to the robbery charges here."). The holdings in *Ruffin* and *Alexander*. do not contravene the rule of lenity—i.e., the principle that courts should resolve doubts about what punishment the legislature intended in favor of the defendant, so as not to "turn[ ] a single transaction into multiple offenses," *id.* at 930 (quoting *Bell v. United States*, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955))—because "[t]he Supreme Court has clearly indicated that where the principal legislative purpose is the protection of individual victims, the rule of lenity does not obtain." *Id.* at 932 (citing

*Ladner*, 358 U.S. at 174, 79 S.Ct. 209); *Murray*, 358 A.2d at 320–21 (holding that "the rule of lenity does not apply to situations involving multiple victims where, as here, both the language and logic of the statute reflect the legislature's intent to safeguard the lives of its constituents as individuals").

In *Ladner*, the Supreme Court held that a defendant who was found guilty of violating a federal statute that proscribed resisting, impeding, or assaulting a federal officer was guilty of a single offense and thus subject to only one punishment even though he wounded two officers. As we noted in *Murray*, the Court so held because it "concluded that it was at least as plausible that the statute's primary purpose was to foster the smooth functioning of the federal government as it was to protect federal officers from harm." 358 A.2d at 320 (explaining that "the thrust of the statute under consideration [in *Ladner*] warranted [that] conclusion ... because it was possible to impede federal officers in the performance of their duties without harming them," such that "the Court could consider 'the act of hindrance as the unit of prosecution without regard to the number of federal officers affected by the act' " (citing *Ladner*, 358 U.S. at 176, 79 S.Ct. 209)).

33. We also reasoned that the impact (which "totaled" a parked car that was hit by the carjacked vehicle) amounted to a battery, supporting separate convictions as to each child.

gravamen of the offense [was] the proscribed effect on each victim, not the acts or omissions leading to it." *Id.* at 716 (emphasis removed). We observed:

> [T]o have it otherwise would compromise the plain language of the statute which does not prohibit any particular defined act or conduct; it prohibits only "engag[ing] in conduct" which has a proscribed effect on a child, i.e., that which creates a "grave risk of bodily injury." This, we think, is a powerful indication of the legislative intent that the "unit of prosecution" under the second-degree cruelty to children statute is the child victim who is exposed to injury by the offender, not the acts which caused the injury.

*Id.* at 717 (emphasis removed).

 We observed in *Williams v. United States,* 569 A.2d 97 (D.C.1989), that the legislative intent behind "[t]he law governing assault is more difficult to discern" than the intent behind statutes proscribing offenses such as homicide and kidnaping. *Id.* at 99 n. 4. We reasoned, however, that "it appears that an assault threatening a group as a whole may be considered a single offense while assaults that threaten or harm individual victims in a group constitute separate offenses." *Id.* Seemingly implicit in our reasoning was the distinction, discussed above, between intent-to-frighten assault and attempted-battery assault.[34] Because the focus of attempted-battery assault is on the potential of an act of force or violence to cause injury to an individual or individuals—a focus "on the consequences of the act, rather than on the act itself," *Murray,* 358 A.2d at 321 n. 23—it makes sense to regard the unit of prose-

cution as the number of individuals actually exposed to injury by the force that was used. Here, a focus on the number of individuals actually exposed to injury dictates allowing the four separate ADW convictions to stand.

Appellant relies heavily on our opinion in *Ruffin,* where we suggested that merger would be required in ADW cases "in which victims were put in fear but were not injured," 642 A.2d at 1297, and stated that "there may be as many offenses as there are victims." *Id.* at 1298. However, in *Ruffin,* we did not consider what result should follow if the defendant's conduct went beyond putting the victims in fear and, although not causing them physical harm, set in motion a force that actually exposed them to injury. The distinction we recognize today is analogous to the difference between, on the one hand, holding a hand grenade in front of a crowd of people but never pulling the pin or throwing the grenade; and, on the other hand, pulling the grenade pin and throwing the grenade into the crowd, putting numerous individuals in danger. We have little difficulty positing that the latter would warrant multiple convictions and sentences.

 Finally, appellant contends and the government agrees that his aggravated assault while armed conviction (count 9) merges with his mayhem while armed conviction (count 10), and that his burglary while armed convictions (counts 11 and 12) merge. We, too, agree. *See Bodrick v. United States,* 892 A.2d 1116, 1122 (D.C. 2006); *Lee v. United States,* 699 A.2d 373, 383 (D.C.1997). Accordingly, we shall remand so that the trial court can vacate either the aggravated assault or mayhem

---

**34.** As we recognized in *Murray,* the statute that penalizes "threats to do bodily harm" (D.C.Code § 22–407 (2001)) "announces the act of threatening to be the intended unit of prosecution." 358 A.2d at 321 n. 23. Our case law implicitly applies the same principle with respect to the similar offense of intent-to-frighten assault, focusing attention upon the defendant's act of "threaten[ing] another in a menacing manner." D.C.Code § 22–404(a).

while armed conviction and one of the burglary convictions.

## Conclusion

We remand for the purpose of allowing the trial court to vacate (1) either appellant's conviction of aggravated assault or his conviction of mayhem while armed and (2) one of appellant's burglary convictions. In all other respects, the judgment of conviction is

*Affirmed.*