*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

## Nos. 12-CF-1434 & 12-CF-1503

JACQUES PARKER & JONATHAN JENKINS, APPELLANTS,

V.

UNITED STATES, APPELLEE.

Appeals from the Superior Court of the
District of Columbia
(CF3-1232-12 & CF3-3203-12)

(Hon. Herbert B. Dixon, Jr., Trial Judge)

(Argued June 13, 2018                    Decided April 22, 2021)

*Fleming Terrell*, Public Defender Service, with whom *Chris Kemmitt*, *James Klein*, *Samia Fam*, *Shilpa S. Satoskar*, and *Emily Voshell*, Public Defender Service, were on the brief, for appellant Jacques Parker.

*Benjamin Brooks* for appellant Jonathan Jenkins.

*Lauren R. Bates*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney at the time the briefs were filed, *Elizabeth Trosman*, *Chrisellen R. Kolb*, *Ronald C. Machen Jr.*, *John P. Mannarino*, and *Patricia Riley*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, WASHINGTON, *Senior Judge*, and OKUN, *Associate Judge, Superior Court of the District of Columbia*.[*]

---

[*] Sitting by designation pursuant to D.C. Code § 11-707(a) (2012 Repl.).

WASHINGTON, *Senior Judge*: Appellants Jacques Parker and Jonathan Jenkins were convicted of committing robbery and felony assault on May 10, 2012. On appeal, both appellants contend that the evidence was insufficient to support their convictions and they also raise various evidentiary concerns. In addition, appellant Jenkins appeals the denial of his motion for relief under D.C. Code § 23-110 based on ineffective assistance of his trial counsel. For the following reasons, we affirm the robbery convictions of both appellants, reverse and remand appellant Jenkins' felony assault conviction with instructions to enter a judgment for simple assault, and affirm the trial court's judgment denying Jenkins' § 23-110 motion for a new trial without a hearing.

## I. BACKGROUND FACTS AND PROCEDURE

The complaining witness, Antonio Walls, testified that on January 13, 2012, appellant Jenkins was one of three people who knocked him to the ground and bruised his eye before his shoes, cellphone, money, and paystubs were stolen.

Mr. Walls further testified that three days later, on January 16, 2012, he was injured and subsequently robbed when he was attacked by approximately fifteen

people, including appellants Jenkins and Parker. Specifically, Mr. Walls testified that he encountered appellant Jenkins in the hallway of his apartment building and that, after Mr. Walls turned down appellant Jenkins' request for a cigarette, he was immediately struck in the face by appellant Jenkins. Mr. Walls then ran outside his building and was immediately attacked by approximately fifteen people who knocked him to the ground and continuously kicked and struck him. Mr. Walls testified that some of his assailants wore masks but that appellants had their masks rolled up, and Mr. Walls could see their faces. He also testified that while he was on the ground, he felt people going through his pockets. Finally, Mr. Walls testified that he was able to get up and run away from the group, but that, as he tried to run to a convenience store to call the police, some of his assailants caught him and took his jacket, keys, and cellphone.

As a result of his attack, Mr. Walls suffered bruising, "sore and [] hurt" legs, a busted lip, and a loose tooth that he "had to push[] . . . back in place." When Officer Pulaski arrived at the scene, she observed Mr. Walls with "some sort of paper towel or gauze held up to his mouth," "blood around his mouth," and a "gash" to his left leg that "wasn't bleeding." Mr. Walls was taken to the hospital by ambulance where he was given medicine for his pain, a brace, and crutches for a "messed up" leg, and may have had X-rays taken before being released that day.

Medical records indicated that Mr. Walls complained of left knee and left forearm pain, but that he remembered the "entire incident," and had no neck, chest, abdominal, pelvic, or lower back pain, and "[n]o broken teeth."

On April 4, 2012, appellant Jenkins was charged with two counts of robbery and one count of felony assault, while appellant Parker was charged with one count each of robbery and felony assault. A pre-trial hearing on appellants' motion to sever took place on April 23, 2012. The trial court subsequently denied the motion. At the same hearing, the trial court also considered and denied appellants' motion to admit expert witness testimony on the unreliability of eyewitness identifications. Trial in this case began on May 1, 2012; appellants were convicted of all charges on May 10 and timely appealed. On appeal, both appellants challenge the sufficiency of the evidence of robbery and felony assault, the trial court's response to a jury note, its exclusion of appellants' expert testimony, the admission of certain evidence, and the trial court's denial of the severance motion. Subsequently, appellant Jenkins filed a motion for a new trial under D.C. Code § 23-110 alleging that his trial counsel was ineffective for agreeing to stipulate to Jenkins' prior incarceration during the trial.

## II. SUFFICIENCY OF THE EVIDENCE

Faced with a challenge to the sufficiency of the evidence, we view the evidence "in the light most favorable to the government, giving full play to the right of the [fact finder] to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence." *In re T.M.*, 155 A.3d 400, 403 (D.C. 2017) (internal quotation marks and citation omitted). We deem the evidence sufficient if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Smith v. United States*, 175 A.3d 623, 627 (D.C. 2017) (quoting *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc)) (emphasis in original); *see also In re T.M.*, 155 A.3d at 403 ("The evidence is insufficient when the government produces no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt.") (internal quotations omitted).

### A. Felony Assault

Appellant Jenkins contends that his conviction for felony assault stemming from the January 16, 2012, assault and robbery must be reversed because the government presented insufficient evidence that Mr. Walls sustained significant bodily injury within the meaning of D.C. Code § 22-404(a)(2) (2020 Supp.). He asserts that though Mr. Walls went to the hospital and undoubtedly suffered "upsetting and painful" injuries, there was no evidence that he suffered significant bodily injury or severe pain. We agree that the government produced insufficient evidence of Mr. Walls' injuries to sustain a felony assault conviction.

Felony assault is committed when a person "unlawfully assaults, or threatens another in a menacing manner, and intentionally, knowingly, or recklessly causes significant bodily injury to another . . . ." D.C. Code § 22-404(a)(2). The statute defines "significant bodily injury" as "an injury that requires hospitalization or immediate medical attention." *Id.* But whether "an injured party immediately goes to a hospital or seeks other medical attention is not, in itself, determinative . . . ." *Quintanilla v. United States*, 62 A.3d 1261, 1264 (D.C. 2013). Nor is the statutory standard satisfied by evidence of "everyday remedies such as ice packs, bandages, and self-administered over-the-counter medications . . . whether administered by a medical professional or with self-help." *Id.* at 1265. The professional medical attention required by the statute must be aimed at one of two

ends: "preventing long-term physical damage and other potentially permanent injuries" or "abating pain that is severe" rather than "lesser, short-term hurts." *Id.* (internal quotation marks omitted). Thus, the relevant inquiry is not whether "immediate medical attention or hospitalization" occurred, but rather "whether medical treatment beyond what one can administer himself is immediately required to prevent long-term physical damage, possible disability, disfigurement, or severe pain." *In re D.P.*, 122 A.3d 903, 912 (D.C. 2015) (internal quotations omitted).

Applying these standards, we conclude that a reasonable jury could not have found that Mr. Walls' injuries were "significant." Though the attack on Mr. Walls was undoubtedly violent and traumatic, the evidence fails to show that immediate medical attention was required to prevent long-term physical damage or other potentially permanent injuries. While Mr. Walls received medicine for his pain, a brace, and crutches after going to the hospital, the government failed to elicit any testimony from Mr. Walls about his need for prompt medical attention, and did not call either the paramedics who arrived on the scene or his treating physician to fill that gap in his testimony. Further, nowhere does the record "suggest that [his] injuries demanded treatment of a higher order, requiring true medical expertise, rather than everyday remedies such as ice packs, bandages, and self-administered

over-the-counter medications." *Wilson v. United States*, 140 A.3d 1212, 1218 (D.C. 2016) (internal quotations omitted).

Although Mr. Walls testified that he thought X-rays may have been taken at the hospital, no evidence was presented that X-rays were actually taken, or what it was about his injuries that would have prompted a doctor to order X-rays. *Cf. Cheeks v. United States*, 168 A.3d 691, 697-98 (D.C. 2017) (discussing doctor's testimony describing how "extensive bodily injuries attributable to the beating . . . led her to order CAT tests to determine whether [the victim] had sustained brain damage, broken bones, or other serious internal injuries"). Similarly, the record is silent on "whether the medication [Mr. Walls received at the hospital] required a doctor's prescription or was available over the counter[,]" or whether Mr. Walls used that medication, the brace, or the crutches after leaving the hospital. *Teneyck v. United States*, 112 A.3d 906, 911 (D.C. 2015). Nor does the record provide any basis to reach the conclusion that Mr. Walls suffered "long-term physical damage, [] disability, disfigurement, or severe pain" from the loose tooth that he himself pushed back into place. *In re D.P.*, 122 A.3d at 912. In sum, the government's evidence did nothing more than invite jurors to speculate that because Mr. Walls sought and received medical diagnosis and treatment, his injuries required "hospitalization or immediate medical attention." D.C. Code § 22-404(a)(2); *see*

*also Nero v. United States*, 73 A.3d 153, 158-59 (D.C. 2013) (differentiating sufficient evidence of felony assault for a potentially "life-threatening" gunshot wound suffered by one victim from insufficient evidence of felony assault for another gunshot victim requiring only "diagnostic tests, pain medication, and wound care"). Because the government failed to produce sufficient evidence that Mr. Walls' injury required treatment "of a higher order," *Quintanilla*, 62 A.3d at 1265, appellant Jenkins' conviction for felony assault must be reversed.

While the evidence was insufficient to support appellant Jenkins' conviction for felony assault, the government did introduce sufficient evidence to support a conviction for the lesser included offense of simple assault beyond a reasonable doubt. We therefore remand the case for an entry of conviction on that offense and for resentencing.[1] *See* D.C. Code § 22-404(a)(1); *Wilson*, 140 A.3d at 1220 (internal citation omitted).

---

[1] Appellant Parker did not raise the same direct challenge to the sufficiency of the evidence for his felony assault conviction and appears to have served his sentence for felony assault concurrent to his robbery sentence while this appeal was pending. Nevertheless, because the evidence supporting appellant Parker's felony assault conviction is the same, "the trial court may, after hearing from the parties, determine whether [his] conviction should [also] be reversed" and reentered as a simple assault conviction "in the interest of justice." *Perez v. United States*, 968 A.2d 39, 105-06 (D.C. 2009).

## B. Robbery

Next, both appellants argue that even if there is sufficient evidence of their participation in the group assault on Mr. Walls to sustain their convictions for simple assault, there is no evidence that they participated in the robbery or intended to rob Mr. Walls on January 16, 2012. Thus, they contend that their robbery convictions based on an aiding and abetting theory must be overturned. We disagree.

To sustain a conviction under an aiding and abetting theory, the government must prove that (1) the principal committed a crime; (2) the defendant "assisted or participated in its commission"; and (3) the defendant's participation "was with guilty knowledge." *Evans v. United States*, 160 A.3d 1155, 1160 (D.C. 2017) (internal quotation omitted). Because robbery is a specific intent crime, the evidence must also show that the appellants had the specific intent to aid and abet the robbery. *See Lancaster v. United States*, 975 A.2d 168, 174 (D.C. 2009) ("Because armed robbery is a specific-intent crime, the government must prove that the aider and abettor shared the same mens rea required of the principals — in this case, the specific intent to steal from Greene."); *see also Williams v. United States*, 113 A.3d 554, 560-61 (D.C. 2015) (noting that to establish robbery under

D.C. Code § 22-2801, the government must prove: "(1) a felonious taking, (2) accompanied by . . . the carrying away, of (3) personal property of value, (4) from the person of another or in his presence, (5) against his will, (6) by violence or by putting him in fear, (7) [with] the intention to steal" (original brackets omitted)).[2]

The evidence in this case was sufficient for a jury to find that appellants aided and abetted the robbery beyond a reasonable doubt based on the evidence presented that appellants were leading and/or participating in the violence that sets robbery apart from simple theft. *See id.* After being confronted and struck in the face by appellant Jenkins inside his apartment building, Mr. Walls ran out of the building and was immediately attacked by approximately fifteen people, including appellant Parker. After Mr. Walls got up and began to flee from the second attack, several of his attackers caught up to him and stripped him of his jacket, keys, and cellphone before he was able to escape. Given these facts, a reasonable jury was entitled to view the entire attack on January 16, as a coordinated venture by a group of assailants. Therefore, viewed in the light most favorable to the government, this evidence supports a "reasonable inference" that appellants' individual assaults on Mr. Walls were undertaken in conjunction with the group's

---

[2] Recently, however, we have expressed concern regarding the use of specific intent and general intent as categories of mens rea. *See Carrell v. United States*, 165 A.3d 314, 323-34 & nn. 26 & 27 (D.C. 2017) (en banc).

efforts to take his property. *Evans*, 160 A.3d at 1161. Thus, we affirm appellants' robbery convictions because "proof of conduct which [so] designedly encourages or facilitates a crime [] support[s] an inference of guilty participation in the crime as an aider and abettor." *Id.* (internal quotations omitted).

## III. JURY NOTE AND REPLY

Consistent with their argument that the evidence was insufficient to convict them of aiding and abetting the robbery in this case, appellants argue that the trial court erred by failing to respond "No" to a jury note that asked whether appellants' assaultive conduct could result in their being convicted of aiding and abetting in a subsequent robbery by opening the door for the robbery even if there was no evidence of appellants' express intent to participate in the robbery. More specifically, the jury asked: "If in the commission of a crime, a defendant opens the door for other crimes committed by other people, without his express intent, is the defendant guilty of any subsequent crimes by way of aiding and abetting?" The trial judge discussed the note with counsel and appellants' counsel urged the court to respond by merely saying "No." The trial judge commented that he did not understand the "new phrase" about "open[ing] the door for other crimes to be committed" and did not "have any idea what[]" was in the jury's "mind" because

the aiding and abetting instruction previously given was already clear and adequately addressed intent.  Ultimately, the trial court decided not to respond "no" and that the jury instructions that had been previously provided appropriately answered the jury's question.  Thus, the trial court replied:  "In response to your note concerning aiding and abetting, I direct you[r] attention to the instruction numbered '3200 4.02' within your package of instructions.  I am unable to give you any further clarifying instruction on that subject."  Instruction 3200 4.02 reads as follows:

> To find that a defendant aided and abetted in committing a crime, you must find that the defendant knowingly associated himself with the commission of the crime, that he participated in the crime as something he wished to bring about, and that he intended by his actions to make it succeed.  Some affirmative conduct by the defendant in planning or carrying out the crime is necessary . . . .  The government is not required to prove that anyone discussed or agreed upon a specific time or method of committing the crime . . . that the crime was committed in a particular way[,] planned[,] or agreed upon; nor . . . that the principal offender and the person alleged to be the aider and abettor directly communicated with each other . . . .  With respect to these offenses, regardless of whether the defendant is an aider and abettor or a principal offender, the government must prove beyond a reasonable doubt that the defendant personally acted with the intent as defined in each of the respective instructions . . . .  It is sufficient if you find beyond a reasonable doubt that the crime was committed by someone and that the defendant knowingly and intentionally aided and abetted in committing the crime.

Earlier, the trial court had discussed the intent necessary to convict appellants of each of the underlying offenses. For robbery, the trial court made it clear that the government had to prove "that the defendant intended to deprive the complainant of his property and take it for his own use." As for assault, the trial court stated that the defendant had to act "voluntarily and on purpose and not by mistake or accident."

In general, "the decision on what further instructions, if any, to give in response to a jury question lies within the sound discretion of the trial court, and absent abuse of that discretion we will not reverse." *(Jeremiah) Gray v. United States*, 79 A.3d 326, 337 (D.C. 2013) (internal brackets and quotations omitted). And we have recognized that "[t]elling jurors to refer back to their original charge may be appropriate in some circumstances" where the "initial instructions 'accurately and thoroughly provided the elements and definitions of the crimes charged.'" *Euceda v. United States*, 66 A.3d 994, 1008 (D.C. 2013) (quoting *United States v. Beckman*, 222 F.3d 512, 521 (8th Cir. 2000)). But, telling jurors to refer back to the original instruction is only permissible when doing so will address the jury's confusion with "concrete accuracy." *(Jeremiah) Gray*, 79 A.3d at 337 (internal quotations omitted).

Therefore, the question on appeal is whether the aiding and abetting instruction provided the jurors with the necessary understanding to address their confusion. *See id.* at 338. On appeal, appellants press the argument that the trial court erred by not responding to the jury's question by simply saying "No." However, the answer to the jury's question would be "No" only if the jury believed the defendants lacked the intent to commit the subsequent robbery. If the jury believed the defendants had the intent to commit the robbery but simply did not explicitly express it to their confederates, answering the jury's question with a "No" would have been misleading. Referring the jury back to the aiding and abetting instruction directly addressed those uncertainties while providing sufficient clarification for the ambiguous hypothetical question posed by the jury.

First, the jury note asks how aiding and abetting applies when a defendant commits a crime that creates an opportunity for other people to commit separate crimes, without an express intent between defendants to commit multiple crimes. The aiding and abetting instruction states in pertinent part that "[t]o find that a defendant aided and abetted in committing a crime, you must find that the defendant knowingly associated himself with the commission of the crime . . . that he intended by his actions to make it succeed," and actively participated "in planning or carrying out the crime." In other words, the aiding and abetting

instruction informs the jury that, in order to find the defendants guilty of aiding and abetting a crime (in this case, the robbery), the jury had to find that the defendants knowingly associated themselves with those committing the robbery, intended by their actions to make the robbery succeed, and took "[s]ome affirmative conduct … in planning or carrying out the crime." The instruction also makes clear that aiding and abetting does not require an express agreement between defendants to carry out the affirmative misconduct. As the instruction notes, the "government is not required to prove that anyone discussed or agreed upon a specific time or method of committing the crime" nor "that the principal offender and the person alleged to be the aider and abettor directly communicated with each other." *See Evans*, 160 A.3d at 1161.

Nonetheless, appellant Parker argues that the jury was confused about the level of intent necessary to convict appellants of aiding and abetting the robbery as opposed to the intent required to commit the assault. He contends that, because the trial court failed to specify that the robbery was the subject of the aiding and abetting instruction, and thus, specifically make reference to the government's burden of proving the intent element of robbery, the jury might have convicted appellants of aiding and abetting the robbery merely because they committed the underlying assault. While it is true that the trial court could have included a direct

reference to robbery in the aiding and abetting instruction, we see no error in failing to do so here because the aiding and abetting instruction specifically informs the jury that in order to find a defendant who is guilty of one crime also guilty of aiding and abetting another crime, the jury must find "beyond a reasonable doubt that the defendant personally acted with the intent" necessary to commit the other crime and that he "knowingly and intentionally aided and abetted in committing [that] crime." Thus, while the aiding and abetting instruction given in this case did not specifically address the intent necessary to be convicted for either of the offenses, it does explicitly tell the jury where to find that information: the intent section of the instructions on the "offenses that are charged in this case," specifically assault and robbery. Because we must "consider the instructions as a whole," *Green v. United States*, 718 A.2d 1042, 1058 (D.C. 1998), and "a single instruction may not be judged in artificial isolation," *Watts v. United States*, 362 A.2d 706, 709 (D.C. 1976) (internal citations and quotations omitted), we are satisfied that the trial court's re-reading of the aiding and abetting instruction adequately addressed any confusion the jury may have initially had about applying the law in this case. Even appellant Parker acknowledges that there is nothing "technically inaccurate" about the trial court's instruction and, under those circumstances, we will not assume the jury misunderstood or overlooked their instructions.

We also reject appellants' argument that the trial court's reinstruction failed to address the jury's confusion about the assault "opening the door" to another crime. Here, appellants admit that "the incident took place in one continuous sequence." Thus, the record supports the trial court's finding that the jury's note about "opening the door" to another crime was not "confusing on this evidence." This is not a case where the jury may have been confused because it was given instructions applicable to only one of the two factual scenarios with which it was presented. *Cf. (Jeremiah) Gray*, 79 A.3d at 337-38 (requiring clarification where note implied that the jury believed one appellant's role began after the crime occurred). To the contrary, no one suggested that the assault and the robbery were separate crimes. In fact, appellants' closing arguments focused on the credibility of the complaining witness and never asked the jury to consider whether the January 16 assault and robbery were separate crimes. Further, appellants fail to explain how specifically referring the jury to the portion of the instruction stating what is necessary to connect the individual assaults to a group robbery "was confusing as applied to the evidence" of those interrelated crimes.

Fourth, and finally, appellants contend that the trial court's response to the jury note, and specifically, its statement that it was "unable to give [] any further

clarifying instruction on the subject," chilled the jury from asking for further help with understanding the relationship between the charged offenses in the context of the aiding and abetting instruction. However, it does not appear from the record that there was a long delay between the reinstruction and the jury reaching a verdict in this case that can be attributed to continued confusion over the aiding and abetting instruction, and, because we agree with the trial court that the instructions given adequately address the jury's confusion, there is no basis for concluding that the jury would have sought further clarification but for the trial court's statement. Further, appellants' requests for the trial court to simply respond "No" to the jury's note neither provided a viable alternative to the aiding and abetting instruction nor raised any concern that the court's previous instruction was an incomplete statement on aiding and abetting. *See Green*, 718 A.2d at 1056-57 (requiring distinct and specific objections to jury instructions). For all of these reasons, we find the trial court did not abuse its discretion in its response to the jury note.

## IV. Eyewitness Identification Expert Testimony

Appellants next argue that the trial court erroneously excluded their eyewitness identification expert. Before the trial began, appellants sought to

introduce testimony from Dr. Steven Penrod, a psychology professor who specializes in eyewitness identification reliability issues.  The trial court precluded defense counsel from calling their expert because "[t]he report [was] untimely, and the basis of the report [attached to the expert notice] is tenuous at best."  We stayed the appeal and remanded the record to the trial court so that it could conduct a *Dyas*[3] hearing regarding the admissibility of appellants' proffered expert testimony.  Following the *Dyas* hearing, where the trial court heard testimony from both appellants' and the government's expert witnesses, the trial court denied appellants' motion to admit their expert testimony.  Appellants challenge the trial court's ruling in this appeal.

## A.  Admissibility of Expert Testimony

We review a trial court's decision on the admissibility of expert testimony for abuse of discretion.  *See Girardot v. United States*, 92 A.3d 1107, 1109 (D.C. 2014) (internal quotations omitted).  When we remanded in 2015 for a decision on whether appellants' expert witness would be allowed to testify, *Dyas* still governed

---

[3]  *Dyas v. United States*, 376 A.2d 827 (D.C. 1977).  *Dyas* adopted and expanded upon the *Frye* standard for admission of expert testimony.  *See Frye v. United States*, 293 F. 1013 (Ct. App. D.C. 1923).

the admissibility of expert testimony.   Under *Dyas*, expert testimony was admissible if:

> (1) the subject matter [is] so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman; (2) the witness [has] sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth; and (3) expert testimony is inadmissible if the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert.

*Dyas*, 376 A.2d at 832 (internal quotations omitted).   However, in 2016 we replaced the *Dyas* standard with the Federal Rule of Evidence 702/*Daubert* standard.  *See Motorola Inc. v. Murray*, 147 A.3d 751, 752 (D.C. 2016) (en banc) (adopting the federal standards on admissibility of expert testimony laid out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)).  Rather than the three-factor test laid out in *Dyas*, we now review the admissibility of expert testimony under the following standard:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:   (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has

> reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Motorola*, 147 A.3d at 757 ("We conclude that Rule 702, with its expanded focus on whether reliable principles and methods have been reliably applied, states a rule that is preferable to the *Dyas/Frye* test.").

Following our remand, the trial court held a hearing and issued its order in 2017, after our decision in *Motorola*. In its decision, the trial court declined to admit the expert testimony based on the *Dyas* factors, rather than the Rule 702/*Daubert* standard we adopted in *Motorola*. The question of whether Rule 702 applied retroactively to cases that had already been tried but were not yet final on direct appeal was left open in *Motorola*, *see*, 147 A.3d at 759, but we have since held that "the standards adopted for the admission of expert testimony in *Motorola* apply to all cases . . . that are still 'pending on direct review or not yet final.'" *Williams v. United States*, 210 A.3d 734, 743 (D.C. 2019) (citing *Davis v. Moore*, 772 A.2d 204, 226 (D.C. 2001) (en banc)). Because the incorrect standard was applied by the trial court, we review the trial court's decision under harmless error standard. *See Carrell*, 165 A.3d at 327 ("'On the hearing of any appeal in any case, the District of Columbia Court of Appeals shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties.'") (quoting D.C. Code § 11-721 (e)). "To

find harmless error, this court must be satisfied 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *Smith v. United States*, 666 A.2d 1216, 1225 (D.C. 1995) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

We conclude that the trial court's error in applying the *Dyas* factors was harmless because the record makes it clear that the trial court's decision to exclude the expert testimony would have been the same if it applied the correct standard. We are satisfied that, because Dr. Penrod's testimony would not "help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a), the trial court's decision to exclude his testimony was consistent with the Rule 702/*Motorola* standard. The trial court excluded the expert testimony in part because Mr. Walls had seen appellant Parker "around the neighborhood more than ten times" and appellant Jenkins "[p]retty much every day," which allowed the trial court to conclude the witness and appellants were "not strangers to each other." Because Dr. Penrod's testimony centered on cases "where the person being identified was not well known" to the witness, and the court determined that there was some level of familiarity between the witness and appellants, it concluded that "the proffered expert testimony would not aid the jury in any meaningful way."

We agree with Dr. Penrod that familiarity exists on a spectrum. Thus, this case is not the situation he describes where "[i]f mom is assaulting me, mom is so well learned I should be able to recognize her in less than a second," which is the level of familiarity where the factors affecting the reliability of identifications would not come into play. But this is also not a case where, as Dr. Penrod implied, Mr. Walls was identifying "somebody that [he'd] seen [for] a very brief period of time at some prior occasion." Mr. Walls' familiarity with appellants Jenkins and Parker fell somewhere in between those two poles, which is why the trial court determined that Dr. Penrod's testimony, focused on stranger identifications, would ultimately be unhelpful to the jury.[4] Application of the *Dyas* standard rather than the Rule 702/*Motorola* standard does not change the fact that the trial court has discretion to make that determination. *See, e.g.*, *Hager v. United States*, 856 A.2d 1143, 1148-49 (D.C. 2004), *amended in part on other grounds*, 861 A.2d 601 (D.C. 2004), *cert. denied*, 547 U.S. 1035 (2006) (finding the trial court did not abuse its discretion in excluding expert testimony on eyewitness identifications because "the studies on which [the expert witness] would have relied concern the

---

[4] This conclusion is aided by the government's expert, who testified that the findings from stranger identification research should not be applied to situations where the witness has a prior acquaintance with the subject of the identification because those situations are "qualitatively different."

reliability of a stranger identification, not an identification of a person known to the witness, as in this case . . . [thus], it is . . . doubtful that [the expert's] testimony would have been helpful to the jury"); *see also United States v. Langan*, 263 F.3d 613, 623 (6th Cir. 2001) (holding expert testimony on eyewitness identifications properly excluded under Rule 702 and *Daubert* because it did not "'fit' the eyewitness identification in this case"); *State v. Guilbert*, 49 A.3d 705, 736-37 (Conn. 2012) (holding expert testimony properly excluded because the "testimony was not applicable to the specific facts of this case and would not have been helpful to the jury because most of the eyewitnesses knew the defendant and were therefore much less likely to render a mistaken identification"); *People v. Abney*, 918 N.E.2d 486, 496 (N.Y. 2009) (upholding trial court's exclusion of defendant's expert witness testimony on identifications in part because "defendant was not a stranger to either [witness]"); *State v. Clopten*, 223 P.3d 1103, 1113 (Utah 2009) ("If the eyewitness is identifying someone with whom he or she has been acquainted over a substantial period of time . . . then expert testimony is not likely to assist the jury in evaluating the accuracy of a witness's testimony."). Dr. Penrod's testimony does not meet the first factor in the Rule 702 test for admitting expert witness testimony because it would not "help the trier of fact to understand the evidence or to determine a fact in issue," and therefore the trial court's error in applying the *Dyas* factors was harmless. Fed. R. Evid. 702(a).

## B. Rule 403 Balancing Test

Even assuming Dr. Penrod's testimony would have met all of Rule 702's requirements and been otherwise admissible, the trial court did not abuse its discretion by keeping out the testimony under Rule 403. *See Johnson v. United States*, 683 A.2d 1087, 1098-99 (D.C. 1996) (en banc) (adopting probative value versus prejudicial effect balancing test of Fed. R. Evid. 403). Otherwise admissible expert testimony may still be excluded by a trial court if "its probative value is substantially outweighed by . . . unfair prejudice, confusing the issues, [or] misleading the jury . . . ." *Motorola*, 147 A.3d at 754 (quoting Fed. R. Evid. 403); *see also Ibn-Tamas v. United States*, 407 A.2d 626, 632 (D.C. 1979) (holding the trial court must still apply the 403 balancing test after determining the expert testimony's admissibility). We have recognized that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Motorola*, 147 A.3d at 755 (quoting *Daubert*, 509 U.S. at 595). Therefore, because of this risk and as part of the trial court's gatekeeping function, "the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Id.* We

evaluate the trial court's decision on the probative versus prejudicial nature of the expert testimony for abuse of discretion. *Motorola*, 147 A.3d at 755.

Here, the trial court found that "the testimony proffered by the defendant would be more prejudicial than probative," and given that the case "does not involve strangers," the testimony would also be "distracting or confusing [to] the jury." *Minor v. United States*, 57 A.3d 406, 419 n.6 (D.C. 2012). While the trial court incorrectly addressed the 403 balancing test as part of the second prong of *Dyas* rather than as a separate test of admissibility, we find no prejudice in the trial court's conclusion that Dr. Penrod's testimony should be excluded under Rule 403.

As noted above, the thrust of Dr. Penrod's testimony focused on eyewitness identifications involving strangers. His testimony therefore had limited probative value in this factual situation, where Mr. Walls was familiar with both appellants, and instead his testimony posed a substantial risk of confusing the issue and misleading the jury. Under such circumstances, the trial court properly exercised its gatekeeping function. *See Heath v. United States*, 26 A.3d 266, 282 (D.C. 2011) (probative value of excluded expert testimony was slight where witness knew defendant, and because expert's opinion rested on research concerning stranger identifications, she "simply had too little to say [to the jury] about the

identifications [her testimony] was meant to undercut"); *see also United States v. Bartlett*, 567 F.3d 901, 906-07 (7th Cir. 2009) (no abuse of discretion under Rule 403 to exclude expert witness testimony where four out of six witnesses knew defendant well); *State v. Williams*, 119 A.3d 1194, 1204-08 (Conn. 2015) (no abuse of discretion in excluding expert testimony where witness knew robber as a "regular" customer). Ultimately, the trial court did not abuse its discretion in excluding the testimony of appellants' expert under Rule 403.

## V.  Other Evidentiary Rulings

Appellant Jenkins' other claims of evidentiary errors are unavailing. We review a trial court's evidentiary rulings for abuse of discretion and will reverse only if the court's exercise of discretion is clearly erroneous. *See Kozlovska v. United States*, 30 A.3d 799, 801 (D.C. 2011). Whether a statement satisfies a particular hearsay exception, however, is a question of law that we review de novo. *Id.*

### A.  Excited Utterances

Appellant Jenkins takes issue with the trial court's admission of Mr. Walls' 911 call and his statements to Officer Pulaski and Detective Bolding shortly after that call where Mr. Walls described how he had been robbed. In appellant Jenkins' view, the statements were "gratuitous" and "improperly bolster[ed] Walls' credibility." The government responds that these statements were admissible as excited utterances. An excited utterance is admissible as an exception to the hearsay rule if that statement meets the following criteria:

> (1) The presence of a serious occurrence or startling event which causes a state of nervous excitement or physical shock in the declarant; (2) a declaration made within a reasonably short period of time after the occurrence so as to assure the declarant has not reflected upon the event and possibly invented a statement; and (3) the presence of circumstances that in their totality suggest the spontaneity and sincerity of the remark.

*Graure v. United States*, 18 A.3d 743, 755 (D.C. 2011) (internal citation omitted). We have made it clear that proof of emotional disturbance is insufficient to justify admission of hearsay under this exception; instead, the evidence must establish that "the individual's powers of reflection have been suspended." *Mayhand v. United States*, 127 A.3d 1198, 1207 (D.C. 2015); *see Graure*, 18 A.3d at 755 ("The critical factor is that 'circumstances reasonably justify the conclusion that the remarks were not made under the impetus of reflection.'") (quoting *Odemns v. United States*, 901 A.2d 770, 777 (D.C. 2006)). The proper standard of proof for

determining the admissibility of an excited utterance is a preponderance of the evidence. *See United States v. Woodfolk*, 656 A.2d 1145, 1150 n.14 (D.C. 1995).

Applying this test to Mr. Walls' three statements, each one meets the definition of an excited utterance. Mr. Walls had been punched, kicked, and hit with bottles by a large group of individuals after he ran out of his building. That certainly qualifies as a "serious occurrence" and his shaken tone of voice and nervous movements when describing the incident to Officer Pulaski support a finding of "nervous excitement" or "physical shock." Similarly, when one combines the temporal proximity of Mr. Walls' statements with the nature of his mannerisms, it is easy to see how his statements satisfy the second element of an excited utterance.

Mr. Walls called 911 at 4:44 p.m. from a grocery store, less than 15 minutes after he had been attacked at around 4:30 p.m. *See Reyes-Contreras v. United States*, 719 A.2d 503, 506 (D.C. 1998) (rejecting challenge to thirty-minute length of time between the startling event and the declarant's statement because declarant was still "crying, yelling, very upset . . . ."); *Harris v. United States*, 373 A.2d 590, 593 (D.C. 1977) (statement made two hours after declarant was shot still held to be reliable because victim was suffering effects of the shooting). Evidence was

presented that Officer Pulaski and Detective Bolding arrived soon thereafter and took his statement. Officer Pulaski testified that when he arrived, Mr. Walls was "visibly injured," "shaken and agitated," and that "[h]e seemed very upset," and Detective Bolding testified that Mr. Walls was injured and "very worried and fearful" while speaking to him. This evidence provides sufficient support for the finding that Mr. Walls' statements occurred within a short period after the attack and that the effects of the attack were still lingering as to make his statements a product of reflex rather than reflection. *See Lewis v. United States*, 938 A.2d 771, 774, 776 (D.C. 2007) (affirming under excited utterance admissibility of answer to police question regarding need for medical attention where declarant was "very, very upset" and repeated herself); *cf. Pelzer v. United States*, 166 A.3d 956, 961 (D.C. 2017) (explaining that the trial court was also "obligated to confirm that the shocking impact of the incident was sufficiently lasting such that the declarant's powers of reflection were still suspended at the time the proffered statement was made").

Lastly, when considering whether the circumstances, in their totality, suggest sincerity in the declarant's statements, we have recognized that a declarant's upset and agitated demeanor supports the sincerity of the declarant's remarks in the excited utterance context, as does the presence of fresh injuries. *See*

*Reyes v. United States*, 933 A.2d 785, 790-91 (D.C. 2007) (noting in light of declarant's upset demeanor and injuries we were "satisfied that any statements made by [declarant] . . . were sufficiently reliable to justify their admission as excited utterances"). This was not a circumstance where Mr. Walls, after escaping an attack, returned home to safety, collected himself, and then gave the police a call to document his encounter demonstrating self-awareness. *Cf. Mayhand*, 127 A.3d at 1211. Instead, Mr. Walls fled from his attackers to a nearby convenience store to call the police for help, then, when they responded, was found "shaken" "very upset," and "moving back and forth." When responding to questions, Mr. Walls was emotional – "shaken" and "angry" – and was also described as "fearful" and "unable to give an adequate account of what happened to him." These circumstances reasonably support the trial court's finding that Mr. Walls' remarks were both spontaneous and sincere. *See, e.g., Goodwine v. United States*, 990 A.2d 965, 966-68 (D.C. 2010) (finding no error in admitting, as an excited utterance, a statement to a police officer who asked the assault victim what had happened when the statement occurred two to three minutes after the victim called 911 and was made in a "fast" and "elevated" voice).

The common thread between Mr. Walls' three statements is that they all occurred in a "reasonably short period of time" after Mr. Walls' attack and under

circumstances from which the trial court could reasonably find that his powers of reflection were suspended and his statements were reliable. *See Graure*, 18 A.3d at 755. Thus, the trial court did not abuse its discretion in admitting them.[5]

## B. Prior Identification

Appellant Jenkins also challenges three out of court statements; two by Detective Bolding, and one by Mr. Wall's cousin, Jerel Henderson, in which Jenkins was identified as the individual who attacked Mr. Walls. He argues that the statements are inadmissible hearsay and gratuitously bolster Mr. Walls' testimony. The government counters that the statements are not hearsay as they fall under the prior-identification exception to the hearsay rule. While prior consistent statements of a witness are generally inadmissible and their "exclusion … is intended to avoid the prejudice of unfairly bolstering the witness' credibility," the "prior identification exception to the [general] rule . . . allows the admission of out-of-court statements through the testimony of . . . a third party who was present

---

[5] Appellant Jenkins contends that these excited utterances "improperly bolster the government's case" as prior consistent statements. While we agree that the general rule is that "prior consistent statements may not be used to bolster an unimpeached witness," *Daye v. United States*, 733 A.2d 321, 325 (D.C. 1999) (internal quotation omitted), "spontaneous utterance[s]" are an exception to this rule. *(Henry) Brown v. United States*, 881 A.2d 586, 599 (D.C. 2005) (citing *Warren v. United States*, 436 A.2d 821, 836 (D.C. 1981)).

when the identification was made." *Taylor v. United States*, 866 A.2d 817, 822 (D.C. 2005) (internal citations omitted). A statement is therefore not hearsay under the prior-identification exception "if the declarant testifies at the trial . . . and is subject to cross-examination concerning the statement and the statement is . . . an identification of a person made after perceiving the person." D.C. Code § 14-102(b)(3) (2012 Repl.). The description of the offense is admissible under the prior-identification exception "only to the extent necessary to make the identification understandable to the jury." *Brown v. United States*, 840 A.2d 82, 89 (D.C. 2004) (internal quotations omitted). "[D]etailed accounts of the actual crime" are inadmissible. *Id.*

Here, the statements in question were properly admitted as prior identifications. Two of the statements come from Detective Bolding's testimony about the photo array identification procedure with Mr. Walls. Detective Bolding testified that Mr. Walls "described [appellant Jenkins] as the leader and stated that he was the one that robbed him," and that Mr. Walls also said appellant Jenkins "asked me for a cigarette, then punched me in the mouth, knocked me to the ground, and robbed me." It is undisputed that Mr. Walls, the declarant, was identifying appellant Jenkins after having perceived him to Detective Bolding when he testified at trial about both statements. A prior identification also requires

that the declarant "is subject to cross-examination concerning the statement," D.C. Code § 14-102(b)(3), but we have held that a declarant's availability to be cross-examined, along with meeting the other requirements, is enough for a statement to be admissible as a prior identification. *See, e.g.*, *Brown*, 840 A.2d at 89 ("Because [declarant] was available for cross-examination, her statement to [the police officer] was admissible as substantive evidence"). While Mr. Walls was not cross-examined specifically about these statements, he was cross-examined extensively about the identification procedures Detective Bolding used during the photo array, and there is no evidence in the record that he was unavailable to be recalled after Detective Bolding testified about his statements. Thus, Mr. Walls' statements to Detective Bolding were properly admitted as prior identification evidence.[6]

The third statement in question comes from Mr. Walls' conversation with his cousin, Jerel Henderson, which occurred approximately one week after the attack. Mr. Henderson testified that when he asked Mr. Walls "who jumped him," Mr. Walls responded "[t]he one you said we was going to have a problem out of";

---

[6] Mr. Walls' statements also do not rise to the level of "detailed accounts of the actual crime." *Brown*, 840 A.2d at 89. Both statements give context to Mr. Walls' claim that appellant Jenkins was the person who punched and robbed him, and we have held that "[s]ome limited reference in the identification to the criminal act is permissible" to make the identification understandable to the jury. *Porter v. United States*, 826 A.2d 398, 410 (D.C. 2003).

Mr. Walls also repeated that statement when Mr. Henderson asked Mr. Walls who had robbed him a few days earlier.  Appellant Jenkins argues that this statement is "prejudicial" and a "needless presentation of cumulative evidence," given Mr. Walls' prior identification of appellant Jenkins during the photo array procedure.  As an initial point, there is no dispute that the statement meets all three elements of the prior identification test.  *See* D.C. Code § 14-102(b)(3).  Also, rather than "unfairly bolstering the witness' credibility," *Taylor*, 866 A.2d at 822, the statement is a separate indication that Mr. Walls knew who appellant Jenkins was before the robbery occurred.  Thus, the trial court properly credited the statement "because the earlier identification has greater probative value than an identification made in the courtroom after the suggestions of others and the circumstances of the trial may have intervened to create a fancied recognition in the witness' mind." *Graham v. United States*, 12 A.3d 1159, 1165 (D.C. 2011).  As with Mr. Walls' statements to Detective Bolding, his statement to Mr. Henderson was a prior identification.  Thus, the trial court did not abuse its discretion in admitting all three of Mr. Walls' statements.

### C.  Character Evidence

Appellant Jenkins next contends that the trial court erred in admitting certain evidence of his bad character. Specifically, Jenkins contends that he was unduly prejudiced by Mr. Walls' testimony regarding his response to his cousin Jerel Henderson's question about who had attacked him, to which Mr. Walls answered, "[t]he one you said we was going to have a problem out of," testimony by Detective Bolding that he was familiar with appellant Jenkins because of his nickname "Goody," and testimony by Detective Bolding that he kept group photographs pulled from Facebook in a binder at the police station and that the photographs included a picture of Jenkins. Appellant Jenkins claims these statements should not have been admitted because "there was a substantial risk that the jury would misuse this information and infer that Mr. Jenkins was a known criminal who was therefore more likely to be guilty of the offense charged."

We review the admissibility of such evidence to determine if it is relevant, or if it "tends to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence." *Winfield v. United States*, 676 A.2d 1, 2 (D.C. 1996) (en banc). This is "not a particularly stringent test." *Rodriguez v. United States*, 915 A.2d 380, 385 (D.C. 2007). We also ensure that relevant evidence is not unfairly prejudicial. *See Gay v. United States*, 12 A.3d 643, 646-47 (D.C. 2011) (noting that "relevant evidence may be excluded if its probative value

is substantially outweighed by the danger of unfair prejudice . . . or by considerations of . . . needless presentation of cumulative evidence").

We conclude that the trial court did not abuse its discretion in admitting these statements. First, all three statements are relevant. As discussed above, Mr. Walls' statement to his cousin was relevant because it was a prior identification of the person who assaulted Mr. Walls. The other two statements are relevant for the same reason. Detective Bolding identified appellant Jenkins' nickname as "Goody," which is the same name Mr. Henderson used for appellant Jenkins when Mr. Henderson was describing appellant Jenkins as one of the people who were regularly "hanging out" in front of Mr. Walls' building. Detective Bolding's testimony therefore corroborated Mr. Henderson's statement. Also, the group photographs from Facebook depicting appellant Jenkins were relevant because they "were the primary means by which [Mr.] Walls identified" appellant Jenkins to Detective Bolding.

Second, the probative value of the statements is not substantially outweighed by the danger of unfair prejudice to appellant Jenkins. Mr. Walls' statement to Mr. Henderson about "[t]he one you said we was going to have a problem out of" has probative value as a prior identification, and in any event, the trial court minimized

any potential prejudice arising from this statement by allowing defense counsel to cast doubt on Mr. Henderson's testimony by establishing that Mr. Henderson and Mr. Walls did not actually "have any beef with [appellant Jenkins]" and that Mr. Henderson did not know Mr. Jenkins. Further, the statements by Detective Bolding regarding appellant Jenkins' nickname and that he had a photograph of appellant Jenkins at the station were not substantially more prejudicial than probative. Detective Bolding testified that he "focus[ed his] work on the police patrol areas of PSA 703 and 704 . . . which includes Pomeroy Road." And, as a result of this work, Detective Bolding came to know of appellant Jenkins' nickname and kept his public Facebook photograph in the station, which is not significantly prejudicial if such knowledge was gained through the course of an officer's official duties and is used to explain a suspect's inclusion in a photo array. That was the case here. *See Rodriguez*, 915 A.2d at 384-87 (evidence that police officers recognized appellant from victim's description based on "prior contacts" and knowing him "from the area" admissible to explain why officers included appellant's photograph in photo array for purposes of identification); *see also Perritt v. United States*, 640 A.2d 702, 704-06 (D.C. 1994) (police officer testimony regarding investigative procedures employed in the case was admissible because jury was entitled to know the circumstances culminating in courtroom identification); *(Joseph) Brown v. United States*, 387 A.2d 728, 730 (D.C. 1978)

("[T]he importance that a jury know of the reality of a fair pretrial identification weighs with more substance in the scales of justice than speculative possibility that the jury may conjecture defendant was involved in some offense."). Finally, the risk that these statements caused the jury to "infer that Mr. Jenkins was a known criminal" is lessened by the fact that, due to the stipulation, the jury already knew appellant Jenkins had been incarcerated. Thus, any prejudice to appellant Jenkins from Detective Bolding's statements did not significantly outweigh their probative value as identification evidence. Because the statements are relevant and not unfairly prejudicial, the trial court did not abuse its discretion by admitting them.

## VI. Jenkins' Severance Motion

Appellant Jenkins also contests the trial court's denial of his pretrial motion to sever his January 13 robbery charge from his January 16 robbery and assault charges.[7] "A motion for severance on the ground of prejudicial joinder is committed to the sound discretion of the trial court." *Parker v. United States*, 751 A.2d 943, 947 (D.C. 2000) (internal quotations omitted). To overcome this discretion, an appellant must show that the failure to sever charges and order

---

[7] Appellant Jenkins does not contest that the two robbery charges were "properly . . . joined under Super. Ct. Crim. R. 8(a) . . . ."

multiple trials under Rule 14 would result in "the most compelling prejudice . . . from which the court would be unable to afford protection if both offenses were tried together." *Id*. (internal quotations omitted); *see also Bailey v. United States*, 10 A.3d 637, 642 (D.C. 2010). There is a presumption that cases that share a similar character are properly joined, so "a motion to sever will be granted only where the evidence would not be mutually admissible at separate trials, or the evidence of the multiple charges is likely to be amalgamated in the jury's mind into a single inculpatory mass." *Bailey*, 10 A.3d at 643 (internal citations omitted). We will reverse the denial of a motion to sever only on a clear showing of abuse of discretion. *Parker*, 751 A.2d at 947 (internal quotation omitted).

After reviewing the trial record, we do not believe the trial court abused its discretion when it denied appellant Jenkins' severance motion, both because the evidence of the two robberies was kept separate and distinct[8] and because evidence

---

[8] The trial court did not rely on the crimes being separate and distinct in denying the motion to sever, but we "may affirm a judgment on any valid ground, including reasons other than those given by the trial court, so long as the appellant has had a reasonable opportunity to be heard with respect to the reasoning on which the proposed affirmance is to be based." *Campbell v. United States*, 224 A.3d 205, 209-10 (D.C. 2020) (internal brackets, quotation marks, and citations omitted). Given that appellant Jenkins raised the risk that the two robberies would not be kept separate by the jury at both the motion to sever hearing, and in his brief, we conclude that he "has had a reasonable opportunity to be heard" on this issue.

of the two crimes was mutually admissible. First, the prejudicial impact of admitting evidence of both robberies did not lead to "the most compelling prejudice," *Parker*, 751 A.2d at 947 (internal quotations omitted), because the evidence was unlikely "to be amalgamated in the jury's mind into a single inculpatory mass." *Bailey*, 10 A.3d at 643. The robberies happened on different days and in different locations, and Mr. Walls testified separately about the two incidents. *See Gooch v. United States*, 609 A.2d 259, 265 (D.C. 1992) (affirming denial of severance motion because robberies were "distinct and uncomplicated" and "presented . . . in a distinct manner"). The trial court at several points also explained to the jury that the two charges were "separate offenses" and that the jury should not let a finding of appellant Jenkins' guilt of one robbery charge "influence your verdict with respect to [the other] charge . . . ." Juries are presumed to follow their instructions. *See Harris v. United States*, 602 A.2d 154, 165 (D.C. 1992) (en banc). Thus, trying both robbery charges at once did not lead to "the most compelling prejudice" because the evidence of each offense was kept "separate and distinct." *Parker*, 751 A2d at 947 (internal quotations omitted).

Second, evidence of the two crimes was mutually admissible. Evidence of other crimes is mutually admissible if: (1) there is clear and convincing evidence the defendant committed the other crime; (2) the evidence is directed to a genuine,

material and contested issue in the case; (3) the evidence is logically relevant to prove this issue for a reason other than criminal propensity; and (4) the prejudicial impact of the evidence does not substantially outweigh its probative value. *See Legette v. United States*, 69 A.3d 373, 379 (D.C. 2013) (internal quotations omitted).

There is clear and convincing evidence that appellant Jenkins committed the January 13 and January 16 robberies because Mr. Walls recognized appellant Jenkins on both occasions, the two robberies happened within three days of each other in an area appellant Jenkins "hung out" in, and Mr. Walls' stolen prescription pill bottle was found inside an apartment building appellant Jenkins frequented. Evidence of each robbery is also directed toward the genuine and material issue of contested fact in the case, whether appellant Jenkins was misidentified as the perpetrator of the robberies. While evidence of the robberies could not be admitted to show appellant Jenkins' propensity to rob, the evidence would have been admissible in separate trials as relevant to show, *inter alia*, identity of the perpetrator of the robberies. *See Legette*, 69 A.3d at 379 (quoting *Drew v. United States*, 331 F.2d 85, 90 (D.C. Cir. 1964)).

Here, appellant Jenkins disputed he was the one who robbed Mr. Walls in both incidents. However, because the robberies were committed within three days of each other, in the same general location, and involved the same victim, the evidence of each robbery was admissible to prove identity. *See, e.g.*, *Coleman v. United States*, 619 A.2d 40, 44-45 (D.C. 1993) (finding evidence of robberies occurring within a two-day period at similar locations in close proximity to each other was mutually admissible to prove identity because "[t]here need only be enough points of similarity in the combination of circumstances to make it reasonably probable that the same person committed all of the offenses"). Finally, the prejudicial impact of admitting evidence of both robberies did not substantially outweigh the probative value of the evidence. As described above, the trial court frequently reminded the jury that the two charges were "separate offenses" and should be kept separate during deliberations. Whatever prejudice may have occurred as a result of trying both robbery charges at once did not substantially outweigh the probative value of each. Thus, the trial court did not abuse its discretion by declining appellant Jenkins' severance motion.

### VII. Ineffective Assistance of Counsel

While his direct appeal was pending, appellant Jenkins filed a motion for a new trial per D.C. Code § 23-110 (2012 Repl.) on October 12, 2017, claiming ineffective assistance of trial counsel. Specifically, appellant Jenkins took issue with the fact that during trial, the government introduced a stipulation that appellant Jenkins had been incarcerated between October 4, 2011, and December 30, 2011.[9] Appellant Jenkins argued that his trial counsel was ineffective both for agreeing to the stipulation that appellant Jenkins was previously incarcerated and for not asking for a limiting instruction informing the jury that it could not infer criminal propensity due to appellant Jenkins' incarceration. On September 18, 2018, the trial court denied appellant Jenkins' § 23-110 motion without a hearing, to which appellant Jenkins timely appealed. While we conclude that the trial court abused its discretion by failing to hold a § 23-110 hearing, we nonetheless affirm on lack of prejudice.

We review the denial of a § 23-110 motion without a hearing for abuse of discretion. *See Metts v. United States*, 877 A.2d 113, 119 (D.C. 2005) (internal quotation omitted). Normally, "when a § 23-110 motion is filed, the trial court should conduct a hearing on the motion." *Lopez v. United States*, 801 A.2d 39, 42

---

[9] The stipulation was read to the jury twice because the first time the government incorrectly stated that appellant Jenkins had been incarcerated in 2012, rather than 2011.

(D.C. 2002). However, a hearing is not required when "the motion and files and records of the case conclusively show that the prisoner is entitled to no relief." D.C. Code § 23-110(c); *see also Bellinger v. United States*, 127 A.3d 505, 515 (D.C. 2015) ("[I]n reviewing a summary denial, we must be satisfied that under no circumstances could the petitioner establish facts warranting relief.") (internal quotation omitted).

Here, the trial court abused its discretion by addressing the deficiency prong of appellant Jenkins' ineffective assistance of counsel claims without first holding a hearing. The court found trial counsel's decision to stipulate to appellant Jenkins' period of incarceration "a strategic decision" and that counsel "was able to strategically use the stipulation to advance its ultimate defense — that [Mr.] Walls mistakenly identified [appellant Jenkins] as his assailant — by demonstrating to the jury that [Mr.] Walls was not a reliable witness." The court similarly concluded that trial counsel's decision not to ask for a limiting instruction was a tactical decision that "may have unnecessarily focused the jury's attention on [appellant Jenkins'] prior incarceration . . . ." While these may be reasonable conclusions to draw from trial counsel's actions, there is nothing in the record from trial counsel himself, either in the transcripts or in a post-trial affidavit, confirming he was making his choices for tactical reasons. Absent such evidence from the

record, "[t]he trial court erred when it repeatedly explained away trial counsel's inaction as 'trial tactics' without a sufficient foundation for doing so . . . ." *(James) Woodard v. United States*, 719 A.2d 966, 969 (D.C. 1998); *see also (Wayne) Gray v. United States*, 617 A.2d 521, 524 (D.C. 1992) ("At the very least … the trial court should have taken testimony from [the appellant's] trial counsel . . . ." before concluding trial counsel's failure to investigate a witness was a reasonable tactical decision); *Alexander v. United States*, 409 A.2d 618, 620-21 (D.C. 1979) ("The judge below could not have concluded on the limited record before him that counsel's failure to raise the defense was a tactical decision . . . [t]here may indeed have been a valid tactical reason for not pursuing the insanity defense . . . . But on the record in the trial court, one is not able to conclude with reasonable certainty what motivated defense counsel to act as he did, and to determine whether his actions amounted to ineffective assistance of counsel.") (internal citations omitted).

Despite the trial court's abuse of discretion, reversal is not required here because we are satisfied that appellant Jenkins did not suffer prejudice that would have resulted in a different outcome and thus, a remand for a hearing is not warranted. *See Clark v. United States*, 136 A.3d 334, 348 (D.C. 2016) (concluding that even though the trial court abused its discretion by not holding a hearing on

certain deficiency claims, because the appellant could not show prejudice, "any need for a hearing on the deficiency allegations is now moot").  To prevail on an ineffective assistance claim, a defendant "must demonstrate both that his counsel's performance was constitutionally deficient, and that the deficient performance prejudiced his defense."  *Dorsey v. United States*, 225 A.3d 724, 727 (D.C. 2020) (internal quotations omitted).  "To demonstrate prejudice, an appellant must show 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Clark*, 136 A.3d at 341 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).  Even if appellant Jenkins' trial counsel was deficient for stipulating to appellant Jenkins' previous incarceration and not asking for a propensity instruction, an issue we do not decide here,[10] appellant Jenkins was not prejudiced because the outcome of the trial would have been the same regardless of these potential deficiencies.  First, the jury heard testimony that Mr. Walls' pill bottle, which was inside Mr. Walls' jacket taken during the assault, was found in an apartment appellant Jenkins frequented.  Second, Mr. Walls and Mr. Henderson frequently saw appellant Jenkins outside the building, and thus, as discussed above, a jury could more reasonably credit

---

[10]  *See (Reynard) Woodard v. United States*, 738 A.2d 254, 259 (D.C. 1999) ("Like the trial court, however, we do not decide this [deficiency] issue because we conclude that Woodard was not prejudiced by defense counsel's failure to consult with him before requesting jury instructions on second-degree murder and manslaughter.").

their identifications of Jenkins. Third, only defense counsel brought up the stipulation to impeach Mr. Walls' credibility; the government did not try and make any improper propensity argument (nor did the jury even know why appellant Jenkins had previously been incarcerated). If anything, taking away defense counsel's chance to attack Mr. Walls' recollection of constantly seeing appellant Jenkins because he was in jail might have made the government's job easier, because there was one fewer seed of doubt about Mr. Walls' credibility in the jury's mind. On this record, there is no reasonable probability that the stipulation and lack of jury instruction would have prevented appellant Jenkins' convictions for assault and robbery. Thus, appellant Jenkins did not suffer *Strickland* prejudice, and we affirm the trial court's denial of his § 23-110 motion.

## VIII. Conclusion

We reverse appellant Jenkins' conviction of felony assault and remand the case for an entry of conviction on the offense of simple assault and for resentencing. On the remaining issues raised by appellants, we affirm.

*It is so ordered.*